**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| RILEY JOHANNESSOHN, DANIEL C. BADILLA, JAMES KELLEY, RONALD KRANS, KEVIN R. WONDERS, WILLIAM BATES, JAMES PINION, individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>POLARIS INDUSTRIES INC.,<br><br>      Defendant. | <u>**CLASS ACTION**</u><br><br><br>Case No. 0:16-cv-03348-PJS-LIB |

**CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, and James Pinion, individually, and on behalf of all others similarly situated, hereby file suit against the Defendant listed above and allege the following:

<u>**INTRODUCTION**</u>

1.      Plaintiffs and class members purchased new Polaris Sportsman four-wheel all-terrain vehicles (ATVs) between built between 2009 and 2016. These off-road vehicles cost approximately $7,000-$13,000.

2.      The Polaris Sportsman ATVs have a common design defect that makes them dangerous to ride. Extremely high temperature exhaust exits the engine and enters the exhaust pipe that is routed directly next to the right leg of the Sportsman rider under a

thin plastic cover. Then, the burning hot exhaust pipe proceeds to the rear on the right side of the Sportsman directly underneath the rider's seat. The exhaust then proceeds through an exhaust pipe towards the right rear tire. The exhaust pipe gets so hot, that components of the Sportsman melt, including, but not limited to, side covers, seat, seat base, right-rear fender, and right foot well. Heat from the exhaust pipe also transfers to surrounding plastic and metal components which are designed to come in direct contact with the rider. As a result, Sportsman riders are directly exposed to temperatures up to nearly 250 °F and can sustain/have sustained burns to their right leg.

3.      Polaris has known about the exhaust heat defect for years. If presented within the six-month warranty, Polaris dealers may replace melted components like seats or fenders. Polaris otherwise refuses to repair the defect. Polaris has publicly stated to the Consumer Product Safety Commission that the heat and melting problems is due to how the rider uses the Sportsman, and denies a design defect. However, many users have posted information contradicting Polaris excuses, including posts on the Consumer Product Safety Commission's websites, Polaris' own ATV forum, and the Better Business Bureau. Since 2009, Polaris has had heat shield kits and seat repair kits available to attempt to repair exhaust heat problems. In March of 2017, after Plaintiffs filed this action, Polaris issued a recall for some of the Sportsman ATVs.[1]

4.      Polaris hid the exhaust heat defect from Sportsman purchasers at the point of sale that would have impacted purchase decisions and purchase price. Polaris' omissions artificially inflated the market price for the ATVs. Polaris could have and should have warned customers about the exhaust heat defect on its website, in its product

---

[1]  See  http://www.polaris.com/en-us/company/article/polaris-recalls-sportsman-850-and-1000-atv-due-to-burn-and-fire-hazards, last accessed on June 27, 2017.

brochures (available online and at Polaris dealerships), and through communications from its authorized dealers. However, Polaris failed to do so.

5.     The Sportsman exhaust heat defect is a latent defect that presents a safety risk to riders, causes damage to components over time, and makes the ATV dangerous and uncomfortable to ride and unfit for its ordinary use. As such, the exhaust heat defect presents a breach of the implied warranty of merchantability.

6.     Polaris had knowledge of the exhaust heat defect before it sold the Sportsman ATVs. As such, Polaris' six-month limitation on the implied warranty of merchantability is unconscionable.

7.     Plaintiffs seek a nationwide class under Minnesota law, where Polaris is located and where the fraudulent conduct at issue occurred. In the alternative, Plaintiffs seek seven statewide classes on behalf of purchasers of Polaris Sportsman ATVs purchased within the applicable statute of limitations of the respective state, and made before the 2017 redesign of certain Sportsman models. These states include Minnesota, California, Florida, Illinois, Missouri, New York, and North Carolina. Plaintiffs bring claims under each state's consumer protection statutes and the implied warranty of merchantability.

## **PARTIES**

8.     Plaintiff Riley Johannessohn is a citizen and resident of Minnesota, over the age of eighteen years. Plaintiff purchased a Polaris Sportsman for recreational use on August 20, 2015 for approximately $11,200.

9.     Plaintiff Daniel C. Badilla is a citizen and resident of California, over the age of eighteen years. Plaintiff purchased a Polaris Sportsman for recreational use on

February 18, 2015 for $10,817.96.

10.     Plaintiff James Kelley is a citizen and resident of Florida, over the age of eighteen years. Plaintiff purchased two (2) Polaris Sportsman for recreational use on December 3, 2015 for approximately $21,000.00 (plus $4,000.00 trade in credit) for a total of $25,000.00.

11.     Plaintiff Ronald Krans is a citizen and resident of Illinois, over the age of eighteen years. Plaintiff purchased a Polaris Sportsman for business and recreational use on August 2016 for approximately $10,600.00.

12.     Plaintiff Kevin Wonders is a citizen and resident of Missouri, over the age of eighteen years. Plaintiff purchased a Polaris Sportsman for recreational use on March 31, 2016 for $8,021.00.

13.     Plaintiff, William Bates, is a citizen and resident of New York, over the age of eighteen years. Plaintiff purchased a 2016 Polaris Sportsman for recreational use on June 18, 2016 for $6,694.00.

14.     Plaintiff, James Pinion is a citizen and resident of North Carolina, over the age of eighteen years. Plaintiff purchased a Polaris Sportsman for recreational use on December 31, 2015 for $12,800.00.

15.     Defendant Polaris Industries Inc., ("Polaris") is a citizen and resident of Minnesota which regularly does business in the Minnesota and all over the United States. Polaris is headquartered at 2100 Highway 55, Medina, MN 55340.

## **JURISDICTION AND VENUE**

16.     This Court has jurisdiction for this case pursuant to 28 U.S.C. § 1332(d), as it is a class action for damages that exceed $5,000,000, exclusive of interest and costs.

Because named Plaintiffs are residents of seven different states (Minnesota, California, Florida, Illinois, Missouri, New York, and North Carolina), many members of the classes are from states different from Defendant, who is incorporated and/or headquartered in Minnesota.

17.      This Court has personal jurisdiction over Defendant because of its continuous and systematic business contacts with the State of Minnesota, the fact that Polaris maintains over a dozen authorized dealers in Minnesota, is headquartered in Minnesota, and derives substantial revenue from sales of its products in Minnesota, with knowledge that its products are being marketed and sold for use in this State.

18.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.      The Polaris Sportsman and Owner's Manual

19.      Polaris is a manufacturer of boats, snow-mobiles and recreational all-terrain vehicles. Polaris has 1800 dealers in North America, and sold 390,000 ATVs in 2015. Polaris had $4.7 billion in sales in 2015, with a gross profit of $1.3 billion, and net profit of $455 million.

20.      Polaris makes several different models of ATVs sold under the name Sportsman. From 2010-2016, Polaris Sportsman are differentiated by engine size, and then trim. These include, but are not limited to, a 400, 450 (HO), 500, 550, 570 (Base, EPS, SP), 800, 850 (Base, XP, SP, High Lifter), a 1000 (XP, SP, High Lifter) and Scrambler. Polaris has sold tens of thousands of these ATVs throughout the United

States.

21.     Each of the Sportsman ATVs come with an Owner's Manual. The manual warns:

> Hot Exhaust Systems: Exhaust system components are very hot during and after use of the vehicle. Hot components can cause burns and fire. Do not touch hot exhaust system components. Always keep combustible materials away from the exhaust system. Use caution when traveling through tall grass, especially dry grass.[2]

The manual says nothing about the exhaust pipe being so hot that it may melt components or burn the rider.

22.     The manual also has within it an express warranty. The warranty repeatedly disclaims coverage for design defects.[3] The warranty does not disclaim the implied warranty of merchantability, but instead limits the warranty's duration to the same short six-month period stated in the express warranty.[4]

**B.     The Polaris Sportsman Has a Design Defect Causing Excessive Heat to Melt Components and Burn Riders.**

23.     Polaris designed the Sportsman to locate the exhaust pipe coming from the engine directly next to the rider. Extremely hot exhaust exits the engine and enters the exhaust pipe located directly next to the right leg of the Sportsman rider, under a thin plastic cover. Then, the burning hot exhaust pipe proceeds to the rear on the right side of the Sportsman directly under the rider's seat. The exhaust then proceeds through an exhaust pipe towards the right rear tire.

24.     The following photograph was taken with an infrared temperature gauge that showed temperatures of nearly 250 °F on the back panel that contacts the rider's

---

[2] 2016 Sportsman Owner's Manual at 24.
[3] 2016 Sportsman Owner's Manual at 152.
[4] 2016 Sportsman Owner's Manual at 154.

right leg. That temperature was reached at idling speed; temperatures are likely to be far higher during use.



25.     For perspective, when a hot water heater is installed in a house, the thermostat is required to be set no higher than 125 °F.

26.     The 250 °F temp is hot enough to melt the seat of the ATV and the plastic cover of the right back wheel fender, as shown in the following photo:



27.    Defendant has received complaints regarding the exhaust temperature causing damage over the years to the fender, the seat, and even burning riders.[5] Some of these complaints from consumers (and their date of posting) include:

**Derek of Liberty, TX on Sept. 22, 2014**
Polaris 800 utv and 570 atv - My friend and I both had 2008/2009 500 rangers. Both very good machines. In 2012 we traded them in for the 800xp camo versions. Mine has 70 hrs, his has about 150hrs. To start with, these things will burn your ** up. The seats get so hot you can feel the plastic weakening under you on the pass side. The heat has ruined both of our seats. Not covered by warranty even though we both have extended coverage. Spoke to dealer. They say the problem is with the EPA, nothing they can do to fix it. The driver's gas foot will cook on an extended ride, 30 minutes or so.

Both of our units are used on the farm. Neither are abused or driven hard. An employee of mine purchased his first 4 wheeler, a 570 on Saturday 9-20-14. At less than 25 miles, his seat is melted, dash display has quit and gas is boiling in tank when it gets to 1/2 tank. It pulls hard to one side and vibrates badly at 30 mph. Polaris products have gone severely downhill.

---

[5]    http://atvconnection.com/forums/polaris/326311-hot-leg-08-800-sportsmans.html,  last accessed September 25, 2016.

That's 30k in junk products. Do not buy Polaris!!!

**Jerry of Stoneham, MA on July 8, 2014**
I have a brand new 2014 Sportsman 570 with EPS. I love the looks, speed, ride and handling of my new machine. However, after about ten hours the machine was running so hot it actually burnt the inside and back of my leg. It also melted the bottom of the seat so it doesn't align properly anymore. I complained to Polaris but of course nobody contacted me.

**John of Columbus, TX on Dec. 30, 2014**
I bought my machine in Oct 2013. The heat under the back seat was notice immediately. It really didn't become a problem until the summer of 2014. The engine heat melted the underside of 2 seats. After the second seat, the dealership screwed some additional heat shielding on the underside of the rear seat. They said if I had any additional heat issues to contact Polaris. Way to neglect your heat issues Polaris! I also had all of the wheel bearings and a output shaft seal replaced before the machine was even a year old. (I just trail ride) I'll be shopping for a Honda next.

**Samantha of Bouctouche, NB on June 11, 2015**
I bought my 2014 Polaris 850 in October 2014. Now here it is June 2015. I took my bike in for service cause one day we were out riding and we noticed our plastic on the right side started to bubble and it had melted my husband's boot! Now that being said that is not normal for a brand new bike to heat up that much. We had heard that it is our fuel pump burning to rich? Odd and I only had warranty for 6 months! And this is going to cost us $220. For just the fuel pump! And god knows how much in labour. So in all I will not be buying another Polaris anymore! I'm not impressed.

**Douglas of Dayton, TN on Sept. 23, 2015**
The heat that comes from the right side of a 2010 Polaris 800 ho sportsman 4x4 is so hot that can hardly stand to ride in summer. Took atv back to shop shortly after buying it - they kept it for about 2 weeks. Call me, told me it was ready went to pick it up. Said Polaris would do nothing. Told me to get some header rap and rep the header pipes! Does this sound like a company that cares about us the consumer paid or should I say we paid good money for something that if we went to one of the other atv sellers could got cheaper but builder in the USA don't mean much anymore when you can

get better things that are built somewhere else.[6]

28.     In a September 2, 2016 complaint to the Better Business Bureau, Polaris was notified about the heat and melting issue, but did provide a trade-in credit that accounted for the defect, and permitted the purchasers to buy an ATV with a different design:

> Complaint: On March 30, 2016, my husband and I decided to purchase a very nice 2015 Polaris Sportsman 1000. Keep in mind all in all after finance charges and taxes, we will be paying exactly $13,298.40. We had a six month warranty on this vehicle meaning ANYTHING that goes wrong will be FIXED at no cost. My husband treated this four-wheeler like his baby, he washed it everyday and everyone told him he needed to treat it like a four-wheeler, they thought he was crazy for spending that amount of money for something he wouldn't even let get dirty. okay, with that being said, fast forward to June 29, 2016, the exhaust was glowing red and getting so hot that it melted through the back plastic where the passengers leg would be. The dealer we bought it from was called and they told us to bring it up there. we had already asked a week ago if the exhaust was supposed to glow and they told us that it was normal so we thought nothing of it. Once it burnt through the plastic, they told us that it was not supposed to be hot enough glow and definitely not hot enough to burn through the plastic. With this being said we left it there to be fixed and we kept calling once we realized that we had been without our four-wheeler for over a month! They kept telling us they had to check the fuel to air ratio and that once they had a response from Headquarters they would be able to fix it.
>
> Finally we got a call on August 15, 2016 that our four-wheeler had been fixed and we could come and pick it up. Upon arrival, we were told that the four-wheeler had been swamped and that was the reason for it being so hot. We knew that was not what happened it had never been in mud but we just took it and left. It was supposed to be fixed and now it is still running hot and we are unable to ride it. we are now being told that others are doing the same thing but it is "not a recall" and they don't know

---

[6]   https://www.consumeraffairs.com/sporting_goods/polaris_atv.html   last   accessed September 25, 2016.

how to fix it. we were told to ride it as fast as we feel comfortable riding it to keep airflow. It's a safety hazard and it's going to cause harm

Desired Settlement: We were offered a $7500 trade in on it which is insane being for one the out the door price was $10,665.00 and we still owe $10,065.00 on it and then some for interest which makes it closer to $12,000. We would like to either have a 100% refund or we would like to get in return something of EQUAL value that will not be a danger to our family. We do not mind making our payments, but we do not want to have to pay the difference for something else. especially since it's a manufacturing problem.

Business Response: Polaris spoke to consumer on Case # C-*******. Consumer was working with Chris. Consumer has been advised that he would have the conversation of trade in assistance but the consumer never called back. If the consumer would like to have this discussion with Chris please call ###-###-#### and reference case # C-******. There is no guarantee anything will be offered but the conversation was offered once the consumer spoke to the dealer about the trade in value.

Consumer Response: Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID ********, and find that this resolution is satisfactory to me. Polaris Industries, Adrenalin Power sports, and I have been discussing our options on the phone and have been coming to a mutual agreement throughout the last couple of days and I am going to trade the four-wheeler in at a higher trade in value and they are working with me on payments and for something that works like it is supposed to and something my husband and I both are satisfied with. We appreciate all the help. We accept all the decisions as long as they go as we have discussed. That we will receive $7500.00 for trade in with an additional $1500.00 and then we are able to get the discount of $700.00 on the RZR 900 S. Thanks to Chris from Polaris and Dillon from Adrenalin we should be getting a very nice product.[7]

29.    Complaints such as these are not only on consumer complaint websites.

---

[7] http://www.polarisatvforums.com/forums/polaris-sportsman-570/55527-found-new-problem-570-exhaust-melting-seat.html, last accessed October 3, 2016.

Threads about them can be found on Polaris' own ATV forums.[8]



05-20-2014, 05:55 PM

**96lt4c4** OFFLINE
Extreme ATV Enthusiast

Member #39866
Join Date: Nov 2013
Location: Bardstown, KY
Posts: 111

**Found a new problem with the 570, exhaust melting seat**

The exhaust temps on this thing must be through the roof. The first thing I noticed, while riding in shorts, is the air coming out of the right foot well will burn you. I also noticed that the right rear top shock bushing is getting too hot and starting to deform, found this when I installed the High Lifter springs. Now I noticed that the heat shield form the exhaust is getting so hot it is melting the bottom of the seat!!! WTF did Polaris do, just throw these things together without doing any testing….I am starting to get a little pissed off.

This is going to have to be a recall.
-----------------------------------------------------------
2014 Sportsman 570 EPS, ITP SS212 Black wheels, 27x9x12 Interco Radial Reptiles, High Lifter Front and rear springs. Custom made foot peg kit, Tamarack TITAN SERIES DELUXE LOUNGER. 2500 Super Winch, American Eagle plow

30.     Customers have even taken to trying to wrap the exhaust system themselves to protect them from the burning exhaust.[9]

31.     Customers have also complained to the Consumer Product Safety Commission. One such complainant noted the melting and safety risks:

I own a 2014 Polaris Sportsman 570 ATV with power steering. I have about 10 hours on the machine and about 70 miles. Within the first couple hours of riding I noticed that the seat was no longer aligning properly while riding. I thought it was odd but kept on riding. After the day I riding I did some reading on the Polaris ATV online forums and read of the excessive heat and melting seat problems. I removed the seat and notices the plastic

---

[8] *See, e.g.,* http://www.polarisatvforums.com/forums/polaris-sportsman-570/55527-found-new-problem-570-exhaust-melting-seat.html, last accessed September 26, 2016.
[9] *See, e.g.,* https://www.youtube.com/watch?v=B2qWHeU2Q3E and https://www.youtube.com/watch?v=F57JvSeh-jE, last accessed on September 25, 2016.

seat bottom was severely melted. The nest time I went on a four hour ride and again while riding the seat was misaligned and I could feel the incredible heat the machines engine was producing. Throughout the day I was unaware the my leg was actually burning on my right side ankle due to the amount of heat. I didn't realize the leg burning until the end of the day once we got back to the house and I removed my socks to get ready for bed. I had heat and burn blisters on my ankle. I am a paraplegic and in a wheelchair and I can't feel my legs from the knees down therefore I never knew I was getting burnt. At this point after spending all my money on my new ATV I am afraid to ride it and get burnt again and I am afraid the seat may even catch on fire.[10]

32.     On October 1, 2014, Polaris responded, disregarding the safety issues of

exhaust problem and blaming the rider – a paraplegic – for making the purchase:

Polaris has been in contact with the consumer regarding this issue and has asked the consumer to contact his dealership so that the vehicle could be properly inspected and repaired if necessary. The consumer has indicated they have a physical disability (paraplegic) that does not allow normal awareness or feeling when exposed to elevated temperatures. Polaris' owner's manual for Owner's Manual for Maintenance and Safety warns that no one with cognitive or physical disabilities should operate this vehicle. Polaris recommends that the consumer pursues the appropriate safety considerations for his unique circumstances.

33.     Polaris acknowledged awareness of the melting seat and exhaust issues, but

claims it is due to rider usage and not a design defect:

Polaris has received reports of some Sportsman 570's experiencing localized deformation, and in some instances, melting of the right side lower seat base supports. Polaris' review of the issue has found that some vehicles being used in extreme operating conditions (i.e. high ambient temperatures and under high loads) may be more susceptible to the issue. Although only a small percentage of the vehicles in service have been affected, Polaris has developed a seat retention kit to address these concerns on those vehicles affected by this issue and one of these kits has been installed on this vehicle. Polaris' records indicate that the consumer has been in contact with his dealer and that steps are being taken to attempt to address the consumer's complaint. Polaris believes this is a customer satisfaction issue and is not an issue that reasonably supports a conclusion that the product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of death or serious injury.

---

[10] http://www.saferproducts.gov/ViewIncident/1418847, last accessed October 3, 2016.

34.    Other customers also complained to the CPSC about out the Sportsman ATVs exhaust heat problems. For instance, in 2011, in response to a Sportsman 800 HO purchaser's complaint that his ATV got very hot on the right side, Polaris personnel replied that

> Under certain operating conditions there can be a gradual heat buildup originating from the engine exhaust area, some of which dissipates in the foot well area. This is a condition common to all ATV's and inherent in the design of the vehicle as well as other recreational vehicles.[11]

35.    Another complaint to the CPSC made in 2012 shows Polaris was aware of seats melting from the exhaust pipe configuration as far back as 2008

> Polaris does offer a heat shield kit for machines such as the one the consumer owns to reduce the possibility of heat related damage to plastic components for machines that are used in conditions that can create additional heat. Polaris also extended goodwill coverage for these machines until December 31st of 2008 if a machine experienced this issue during the extended time period. This effectively gave this consumer eighteen months of coverage for this issue.[12]

36.    Upon information and belief, the seat repair kit costs approximately $35.99, and the heat shield kits costs approximately $63.50. These are temporary fixes: the exhaust heat defect will still melt the seat, footwell, side covers or fenders, and burn the rider.

37.    In March of 2017, after Plaintiffs filed this action and argued the motion to dismiss, Polaris instituted a recall of 2015-2016 Sportsman ATVs 850 and 1000 models.[13] The recall notice conceded, "Polaris has received at least 793 incidents,

---

[11] See https://www.saferproducts.gov/ViewIncident/1276795, last accessed on June 26, 2017.

[12] See http://www.saferproducts.gov/ViewlncIdent/1269864, last accessed June 27, 2017.

[13] See http://www.polaris.com/en-us/company/article/polaris-recalls-sportsman-850-and-1000-atv-due-to-burn-and-fire-hazards, last accessed June 28, 2017.

including reports of warped, melted or burned side panels, 47 fires and four minor burn injuries." This recall only affected about 19,200 ATVs.

38.     The recall repairs do not alter exhaust system of the ATVs, but mainly consist of adding some heat shielding to areas around the exhaust pipe. Moreover, the recall repairs take considerable time. For example, Plaintiff Johannessohn did not get his ATV back for three (3) weeks. The recall does not reimburse purchasers for their lost usage of their ATV. It also appears that the limited repairs done under this recall do not prevent recurrence of the exhaust heat defect in the subset of models Polaris covered by the recall.

39.     For some of the 2017 Sportsman models, Polaris redesigned the exhaust system so its hottest points are not underneath the driver or next to his or her right leg. The new design also provides additional heat shielding.

**B.     Despite Opportunities, Polaris Failed to Inform Potential Purchasers of the Sportsman's Exhaust Heat Defect**

40.     Polaris has a product website for its Sportsman ATVs.[14] The website features information about and pictures of the Sportsman ATVs. The ATV is described in various ways, including, a) "Home to the best-selling Automatic 4x4 ATV of all time – with legendary ride and handling, the Sportsman®; b) "ATV gets you through the toughest trails and the biggest jobs."; c) "The Sportsman® is designed to withstand anything from the farm yard, to the pastures and the trail with its hardest working features."; d) "Sportsman's value-class ATVs offer features to get the toughest jobs done and legendary smooth riding when you're ready to hit the trail." In no instance did the website inform the readers about the Exhaust Heat Defect.

---

[14] *See, e.g.,* http://www.polaris.com/en-us/atv-quad, last accessed on July 3, 2017.

41.     The website also has a "find a dealer near you" search box. These authorized dealers also have information about the Sportsman ATVs, provided to them by Polaris. As detailed below, these detailers did not apprise Plaintiffs or similarly situated consumers about the Exhaust Heat Defect.

42.     The website also has some of the product brochures of Polaris products. This includes the 2015 product brochure for off-road vehicles including the Sportsman ATVs.[15] Screenshots of the brochure relevant to the Sportsman are below. The brochure discussed several attributes and aspect of the Sportsman, but does not inform readers about the Exhaust Heat defect.



---

[15] *See, e.g.,* http://polaris.hs.llnwd.net/o40/crp/2015/documents/brochures/2014-orv-brochure.pdf., last accessed on July 3, 2017.



43.     Polaris also has YouTube channels displaying their channels in action.[16] These videos, which demonstrate products like the Sportsman in action, provide information about the Sportsman ATVs that prospective purchasers could review. The videos on the Polaris channel do not disclose any information about the Exhaust Heat Defect.

### C.     Plaintiffs' Experiences

#### a.     Riley Johannessohn

44.     Plaintiff Riley Johannessohn purchased his Sportsman ATV in Eveleth, Minnesota at 5 Season Sports on August 20, 2015. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

---

[16] *See, e.g.,* https://www.youtube.com/user/PolarisORV/search?query=sportsman, last accessed July 3, 2017.

45.     Mr. Johannessohn has experienced high temperatures on his Sportsman due to the exhaust heat defect. This includes high temperatures and burns to his leg and the right side cover of the ATV melted on more than once.

46.     Mr. Johannessohn has given notice of the exhaust heat defect to Polaris, having returned his Sportsman to the dealer for repairs. The dealer stated that the exhaust needed to be replaced as the baffles had melted. After the alleged repair by the dealer, a test drive of his supposedly repaired 2015 Sportsman resulted in a fire that destroyed his Sportsman. He received credit from Polaris to buy a replacement 2015 Sportsman ATV. That ATV has the same exhaust heat defect, causing leg burns and required replacement of the side covers.

47.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Johannessohn would have learned of that material information, and would not have purchased his Polaris Sportsman ATV..

### b.      Daniel Badilla

48.     Plaintiff Daniel Badilla purchased his Sportsman in El Centro, California at Imperial Valley Cycle Center on February 18, 2015. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

49.     Mr. Badilla's Sportsman has demonstrated the exhaust heat defect. This includes some burns to his right leg and physical damage to his Sportsman, including melting plastic and his seat melting.

50.     Mr. Badilla has provided notice of the exhaust heat defect to Polaris, having had contacted his dealer about excessive heat. The dealer told him that such heat was

normal, and there was nothing that he would do. As a result, Mr. Badilla is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

51.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Badilla would have learned of that material information, and would not have purchased his Polaris Sportsman ATV.

### c.     James Kelley

52.     Plaintiff James Kelley purchased his Sportsman in Kissimmee, Florida at Kissimmee Motorsports, Inc. on December 3, 2015. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

53.     Mr. Kelley has experienced high temperatures on his Sportsman due to the exhaust heat defect. This includes burns to his leg and physical damage to his Sportsman including damage to right side plastic covers which have melted as a result of the high exhaust temperatures.

54.     Mr. Kelley has given notice of the exhaust heat defect to Polaris, having returned his Sportsman to the dealer for repairs. The repairs performed by the dealer did not correct the exhaust heat defect. Rather, Mr. Kelley was only provided new plastic covers to replace the burned plastic side covers. Moreover, Mr. Kelley, has been advised by his Polaris dealer that there is no fix for the exhaust heat issue. As a result, the Sportsman is uncomfortable to ride, and Mr. Kelley is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

55.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Kelley would have learned of that material information,

and would not have purchased his Polaris Sportsman ATV.

### d. *Ronald Krans*

56.     Plaintiff Ronald Krans purchased his Sportsman ATV in Canton, Illinois at Slaight's Yamaha Polaris Cub-Cadet Kar Korner, Inc. in August of 2016. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

57.     Mr. Krans has experienced high temperatures on his Polaris Sportsman due to the exhaust heat defect. This includes high heat/burns to his leg and his passenger's leg and glowing red hot exhaust dangerously close to his right leg as a result of the high exhaust temperatures.

58.     Mr. Krans has given notice of the exhaust heat defect to Polaris, and was told that the high exhaust heat was normal. Moreover, Mr. Krans has been advised by his Polaris dealer that there is no fix for the exhaust heat issue. As a result, the Sportsman is uncomfortable to ride, and Mr. Krans is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

59.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Krans would have learned of that material information, and would not have purchased his Polaris Sportsman ATV.

### e. *Kevin Wonders*

60.     Plaintiff Kevin Wonders purchased his Sportsman ATV in West Plains, Missouri at Mega MotorSports in March of 2016. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

61.     Mr. Wonders has experienced high temperatures on his Sportsman due to the exhaust heat defect. This includes burns to his leg.

62.     Mr. Wonders has given notice of the exhaust heat defect to Polaris, having complained to his dealer about excessive heat burning his leg. His dealer informed him that there is no fix for the exhaust heat issue and that high heat levels were "normal." As a result, the Sportsman is uncomfortable to ride and Mr. Wonders is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

63.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Wonders would have learned of that material information, and would not have purchased his Polaris Sportsman ATV.

### f.     William Bates

64.     Plaintiff William Bates purchased his Sportsman ATV in Adams Center, New York at Waite Motorsports in Junes of 2016. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

65.     Mr. Bates has experienced high temperatures on his Sportsman due to the exhaust heat defect. This includes burns to his leg. Mr. Bates has given notice of the exhaust heat defect to Polaris, having complained to his dealer about excessive heat burning his leg. His dealer informed him that there is no fix for the exhaust heat issue. As a result, the Sportsman is uncomfortable to ride and Mr. Bates is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

66.     Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Bates would have learned of that material information, and

would not have purchased his Polaris Sportsman ATV. .

### g.    *James Pinion*

67.    Plaintiff James Pinion purchased his Sportsman ATV in Garner, North Carolina at Team PowerSports in December of 2015. At the time of his purchase he had reviewed Polaris marketing material, including its website and product brochures, and also discussed his purchase with an authorized Polaris dealer.

68.    Mr. Pinion has experienced high temperatures on his Sportsman due to the exhaust heat defect. This includes redness and burns to his leg and his daughter's leg, and damage to the right side cover and seat of his Sportsman.

69.    Mr. Pinion has given notice of the exhaust heat defect to Polaris, having returned his Sportsman to his dealer for repairs. His dealer informed him that there is no permanent fix for the exhaust heat issue. As a result, the Sportsman is uncomfortable to ride and Mr. Pinion is concerned about his safety as well as his family's safety when riding his Polaris Sportsman.

70.    Had Polaris disclosed the exhaust heat defect in its brochures, on its websites, or to its dealers, Mr. Pinion would have learned of that material information, and would not have purchased his Polaris Sportsman ATV.

### CLASS ALLEGATIONS

71.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 70.

72.    Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3) Plaintiffs assert a national class based upon Minnesota law

    a.  All purchasers of new Polaris Sportsman ATVs purchased from October 4,

2010 to October 4, 2016.

73.     In the alternative, if the Court finds Minnesota law cannot apply to all purchases nationwide, Plaintiffs seek seven separate statewide classes:

a)  Minnesota:  All  residents  of  Minnesota  who  purchased  new  a  Polaris Sportsman ATV from October 4, 2010 to October 4, 2016.

b)  Florida Class: All residents of Florida who purchased new a Polaris Sportsman ATV from October 4, 2012 to October 4, 2016;

c)  California Class: All residents of California who purchased new a Polaris Sportsman ATV from October 4, 2013 to October 3, 2016;

d)  Illinois Class: All residents of Illinois who purchased new a Polaris Sportsman ATV from October 4, 2013 to October 4, 2016.

e)  Missouri Class: All residents of Missouri who purchased new a Polaris Sportsman from October 4, 2011, to October 4, 2016.

f)  New York Class: All residents of New York who purchased new a Polaris Sportsman ATV from October 4, 2013 to October 4, 2016.

g)   North Carolina: All residents of North Carolina who purchased new a Polaris Sportsman ATV from October 4, 2012 to October 4, 2016.

74.     Excluded  from  the  Class  are  purchasers  of  the  2017  model  of  the Sportsman, the Defendant, any entity in which Defendant has a controlling interest, and Defendant's  officers,  directors,  legal  representatives,  successors,  subsidiaries,  and assigns. Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

75.     This action has been brought and may properly be maintained as a class

action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through the Defendant's own records, or that of Defendant's dealers.

76.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

77.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis allege, that the proposed Class is so numerous that joinder of all members would be impracticable as Defendant has sold thousands of the ATVs nationwide during the proposed class period.

78.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including *inter alia*:

  a.     Whether the Sportsman ATVs suffer from a common design defect;

  b.     When Defendant knew of the exhaust heat defect;

  c.     Whether Defendant omitted material facts about the Sportsman at the time of sale, including the propensity of the Sportsman's exhaust to melt the seat, fender and foot-well, and burn riders;

  d.     Whether Defendant breached the implied warranty of merchantability by selling ATVs that may melt other components and burn riders;

  e.     Whether Minnesota law applies to all transactions in light of Minnesota being the locus of Defendant's fraudulent behavior;

f.      Whether the Defendant's conduct was unconscionable.

79.     Plaintiffs are members of the putative Classes. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

80.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes, as their interests coincide with, and are not antagonistic to, the other Class members. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

81.     Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Classes predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

82.     A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

83.     The benefits of proceeding as a class action, including providing a method

for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

84.     Plaintiffs also seek class certification under Fed. R. 23(b)(2) to hold that the six-month limitation on the implied warranty is unconscionable in light of Defendant's knowledge of the latent defect, and the likelihood of it manifesting after the six-month limitation. A class-wide ruling striking that limitation would allow class members to obtain additional relief for deformations resulting from the design defect.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT
### MN STAT. §325F.69 et seq.
### (By All Plaintiffs for all Purchasers, or Alternatively, Plaintiff Johannessohn for All Minnesota Purchasers)

85.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

86.     Defendant's practices were and are in violation of Minnesota's Consumer Fraud Act, Minnesota Statutes § 325F.69.

87.     Defendant is a person as defined in Minnesota Statutes §325F.68, subd. 3.

88.     As alleged, Defendant engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in Minnesota. Specifically, Defendant omitted material information regarding the exhaust heat defect described herein, which can melt components of the ATV and burn the rider. These are material facts of which each class member should have been informed before purchasing their Sportsman ATV.

89.     Through its website, product brochures, and communications with its authorized dealers, Defendant could have related information about the exhaust heat defect afflicting the Sportsman ATVs to consumers before the customers made their purchase, but failed to do so.

90.     The fraudulent behavior occurred at Defendant's headquarters in Minnesota. That is where decisions were made, after knowledge of the exhaust heat defect, to continue to sell the Sportsman ATVs and omit material information from its website, brochures, and authorized dealers that would have reached the Plaintiffs and similarly situated buyers. Minnesota therefore has the strongest interest in policing the misconduct of one of its state's corporations, and Minnesota law should apply.

91.     Defendant owed Plaintiff Johannessohn and those similarly situated a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information about the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

92.     Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

93.     Defendant's conduct has a nexus with traditional consumer protection concerns, as the ATVs are purchased by thousands of consumers throughout the country and in Minnesota.

94.     Plaintiff Johannessohn and the other members of the National or Minnesota Class purchased their Sportsman ATVs new from Defendant's authorized dealers, but did

not obtain the full value of the advertised products. If Plaintiff and the other members of the class had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

95.    In addition, as a result of these unfair and deceptive trade practices, Plaintiff Johannessohn and the National or Minnesota Class members have suffered actual injury in that they paid more for their Sportsman ATVs because Defendant's omissions artificially inflated the purchase price.

96.    As a direct result of Defendant's unlawful deceptive business practices, Plaintiff Johannessohn and the National or Minnesota Class suffered injury by lost money or property.

97.    Plaintiff Johannessohn and the National or Minnesota purchasers seek an award of damages for violations of Minnesota Statutes § 325F.69 pursuant to Minnesota Statutes § 8.31, subd. 3a.

98.    Plaintiff Johannessohn and the National or Minnesota Class seek an award of attorneys' fees for violations of Minnesota Statutes § 325F.68-§ 325F.69 pursuant to Minnesota Statutes § 8.31, subd. 3a. and all other relief as appropriate.

## COUNT II

### VIOLATION OF UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code - § 17200, *et seq.*
### (By Plaintiff Badilla on Behalf of All California Purchasers)

99.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

100.    California Business and Professions Code § 17200, *et seq.* prohibits "any unlawful, unfair or fraudulent business act or practice."   CAL. BUS. & PROF. CODE §

17200.

101.    Throughout the Class Period, Defendant engaged in unlawful business acts and/or practices by selling and/or distributing Sportsman ATVs that violated the Song-Beverly Warranty Act and California's Implied Warranty of Merchantability, as the heat exhaust issue presented a safety issue to riders.

102.    Defendant further engaged in unlawful business acts and/or practices by not informing consumers that Defendant's Sportsman ATV could cause risks of product deformation and burns due to the heat exhaust issue.

103.    Through its website, product brochures, and communications with its authorized dealers, Defendant could have related information about the exhaust heat defect afflicting the Sportsman ATVs to consumers before the customers made their purchase, but failed to do so. Had Defendant conveyed information about the exhaust heat defect through those channels, Mr. Badilla would have learned of the defect and had not made the purchase.

104.    The acts, omissions, and practices alleged herein also constitute unfair business acts and practices in that Defendant's conduct is immoral, unscrupulous, and offends public policy by seeking to profit from selling ATVs that possess a latent defect that could injure riders.

105.    Defendant's practices also constitute "fraudulent" conduct. Defendant owed Plaintiff Badilla and similarly situated Californians a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about

the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

106.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

107.   As a direct result of Defendant's unlawful, unfair, or fraudulent business acts and/or practices, Plaintiff Badilla and Class members suffered injury in fact and lost money or property. Plaintiff Badilla and Class members purchased ATVs that they would not have had they known the material information about the heat exhaust design defect.

108.   In addition, Plaintiff Badilla and all California customers paid too much for the ATVs as Defendant's omissions allowed it to artificially inflate the value of the Sportsman ATVs.

109.   Defendant profited from its sales of its falsely and deceptively advertised products to unwary California customers.

110.   Accordingly, Plaintiff Padilla, on behalf of himself and all others similarly situated, seek restitution, injunctive relief against Defendant in the form of an order prohibiting Defendant from engaging in the alleged misconduct described herein, and other relief as specifically prayed for herein.

## COUNT III

**VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT**
**- Cal. Civ. Code § 1750**
**(By Plaintiff Badilla on Behalf of All California Purchasers)**

111.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

112.    Polaris is a person as defined by California Civil Code § 1761(c).

113.    The Sportsman ATVs are goods within the meaning of California Civil Code §1761(a).

114.    Plaintiff Badilla and the Class are consumers within the meaning of California Civil Code §1761(d), and their sale to consumers constitutes a transaction under §1761(e).

115.    Through its fraudulent omissions of the exhaust heat defect, Polaris violated Cal. Civ. Code § 1770(a)(5), by  representing that the Sportsman ATVs had "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" that they did not have.

116.    Through its fraudulent omissions of the exhaust heat defect, Polaris violated California Code § 1770(a)(7) by representing that goods are of a particular standard, quality or grade that they did not have.

117.    The information regarding the exhaust heat defect withheld from Mr. Badilla and the Class was material information that would impact the ordinary consumer making a transaction.

118.    Defendant owed Plaintiff Badilla and similarly situated Californians a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable

consumers. Had Defendant conveyed information about the exhaust heat defect through those channels, Mr. Badilla would have learned of the defect and had not made the purchase.

119.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

120.   Had Mr. Badilla known about the exhaust heat defect, he would not have purchased his Polaris Sportsman ATV.

121.   As a result of Polaris' conduct, Plaintiff Badilla and the Class have suffered actual damages. Plaintiff Badilla and Class members purchased ATVs that they would not have had they known the material information about the heat exhaust design defect.

122.   In addition, Plaintiff Badilla and all California customers paid too much for the ATVs as Defendant's omissions allowed it to artificially inflate the value of the Sportsman ATVs.

123.   Plaintiffs Plaintiff Badilla and the Class seek an order requiring Polaris to disgorge all ill-gotten gains and provide full restitution of all monies it wrongfully obtained from Plaintiff and the Class through the scheme described herein. See Civil Code § 1780(a).

124.   Consistent with §1782(a), Plaintiff Badilla, through counsel, provided a notice of claims to Polaris on October 5, 2016. That notice period has expired, and Polaris has not corrected the defect nor provided relief to Plaintiff Badilla.

125.   Plaintiff Badilla and the Class seek an award of actual damages under Civil Code § 1780(a).

126.   Plaintiff Badilla and the Class seek an award of attorneys' fees under Civil

Code § 1780(e).

## COUNT IV

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT - Florida Stat. §§ 501.201-.213.
### (By Plaintiff Kelley on Behalf of All Florida Purchasers)

127.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

128.    In Florida, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

129.    Plaintiff Kelley, individually, and the members of the putative Class are "consumers" within the meaning of Florida Statute § 501.203.

130.    Defendant's practice of omitting material information about the Polaris Sportsman ATVs constitutes unfair, deceptive, or unconscionable trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") as provided by §§ 501.201-.213.

131.    As a result of Defendant's unfair and deceptive trade practices, Plaintiff Kelley and Class Members have suffered actual damages in that they would not have not purchased their Sportsman ATVs if Defendant had omitted the heat exhaust problems.

132.    In addition, as a result of these unfair and deceptive trade practices, Plaintiff Kelley and the members of the putative Class, have suffered actual damages in that they paid more for their Sportsman ATVs because Defendant's omissions artificially inflated the purchase price.

133.    Plaintiff Kelley and Florida Class Members are entitled to recover compensatory damages, costs, and reasonable attorneys' fees.

## COUNT V

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 Ill. Comp. Stat. 505/1, et seq.
### (By Plaintiff Krans on Behalf of All Illinois Purchasers)

134.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

135.    Plaintiff Krans and other members of the Illinois Class, are purchasers of Polaris Sportsman ATVs and consumers within the meaning of Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), given that Polaris' business activities involve trade or commerce, and are addressed to the market generally and otherwise implicate consumer protection concerns.

136.    The allegations set forth herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud Act.

137.    The exhaust heat defect described herein, which can melt components of the ATV and burn the rider are material facts of which each class member should have been informed before purchasing their Sportsman ATV.

138.    Defendant owed Plaintiff Krans and those similarly situated a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable

consumers. Had Defendant conveyed information about the exhaust heat defect through those channels, Mr. Krans would have learned of the defect and had not made the purchase.

139.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

140.   Defendant's conduct has a nexus with traditional consumer protection concerns, as the ATVs are purchased by thousands of consumers in Illinois, most of whom purchased the Sportsman ATV for household or recreational use.

141.   Defendant intended that Plaintiff Krans and other members of the Illinois Class would rely on its deception by purchasing the Sportsman ATV, unaware of the material facts described above. This conduct constitutes consumer fraud within the meaning of the Illinois Consumer Fraud Act.

142.   Plaintiff Krans and the other members of the Illinois Class purchased their Sportsman ATVs new from Defendant's authorized dealers, but did not obtain the full value of the advertised products. If Plaintiff Krans and the other members of the class had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

143.   Plaintiff Krans and the other members of the Illinois Class are therefore entitled to recover compensatory damages and other relief, including costs and fees, as provided under the Illinois Consumer Fraud Act.

**COUNT VI**

**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**R.S. Mo. Chapter 407 et seq**
**(By Plaintiff Wonders on Behalf of all Missouri Purchasers)**

144.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

145.   Plaintiff Wonders brings this claim individually and on behalf of the above-described class of consumers, all of whom purchased a Sportsman ATV primarily for personal, family or household purposes.

146.   The allegations set forth herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the Missouri Merchandising Practices Act (MMPA).

147.   The exhaust heat defect described herein, which can melt components of the ATV and burn the rider are material facts of which each class member should have been informed before purchasing their Sportsman ATV.

148.   Defendant owed Plaintiff Wonders a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

149.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

150.   Defendant intended that Plaintiff Wonders and other members of the Missouri Class would rely on its deception by purchasing the Sportsman ATV, unaware

of the material facts described above. This conduct violates the MMPA.

151.   Plaintiff Wonders and the other members of the Missouri Class purchased their Sportsman ATVs new from Defendant's authorized dealers, but did not obtain the full value of the advertised products. If Plaintiff and the other members of the class had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

152.   In addition, as a result of these unfair and deceptive trade practices, Plaintiff Wonders and the Class Members have suffered actual damages in that they paid more for their Sportsman ATVs because Defendant's omissions artificially inflated the purchase price.

153.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Wonders and the Missouri class members have suffered an ascertainable loss of money under the benefit of the bargain theory by paying more for their Sportsman ATVs than those products were worth had Polaris not withheld material information. Damages under the benefit of the bargain model should be awarded as the lesser amount of (1) the diminution in value of the Sportsman ATVs, or (2) the cost of repair to bring the ATVs into conformance with Polaris' representations that the vehicles are safe and not defective.

## COUNT VII

### VIOLATION OF NY GENERAL BUS. LAW § 349, et seq.
### (By Plaintiff Bates on Behalf of All New York Purchasers)

154.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

155.   Plaintiff Bates and Class Members are consumers of Defendant's products and are the end users and intended beneficiaries of said products.

156.   Defendant is engaged in consumer-oriented conduct within the intended ambit of N.Y. Gen. Bus. L. § 349. ("GBL §349").

157.   Defendant's actions and/or omissions as described herein violated GBL § 349, et seq., which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

158.   The allegations set forth herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of the N.Y. Gen. Bus. L. § 349.

159.   The exhaust heat defect described herein, which can melt components of the ATV and burn the rider are material facts of which each class member should have been informed before purchasing their Sportsman ATV.

160.   Defendant owed Plaintiff Bates and those similarly situated a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information about regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

161.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

162.    Plaintiff and the other members of the New York Class purchased their Sportsman ATVs new from Defendant's authorized dealers, but did not obtain the full value of the advertised products. If Plaintiff and the other members of the class had known the true nature of Defendant's product, they would not have purchased the ATV for the price they paid.

163.    In addition, as a result of these unfair and deceptive trade practices, Plaintiff Bates and the Class Members have suffered actual injury in that they paid more for their Sportsman ATVs because of Defendant's omissions artificially inflated the purchase price.

164.    As a direct result of Defendant's unlawful deceptive business practices, Plaintiff Bates and the Class suffered injury by lost money or property.

165.    Defendant engaged in the same or similar unlawful deceptive business practices against the Class and caused harm to Class members.

166.    Accordingly, Plaintiff Bates seeks on behalf of himself and for all those similarly situated, compensatory and consequential damages, equitable and injunctive relief, costs and reasonable attorneys' fees and all other relief as appropriate.

## COUNT VIII

**NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. Gen. Stat. § 75-1.1(a).**
**(Brought by Plaintiff Pinion on Behalf of All North Carolina Purchasers)**

167.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

168.    In North Carolina, "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are

declared unlawful." N.C. Gen. Stat. § 75-1.1(a).

169.   Defendant's sale of Sportsman ATVs was "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a) because Defendant was engaged in a business activity.

170.   Defendants' practice of not disclosing material information to its customers at the point of sale constitutes an unfair and deceptive trade practice in violation of North Carolina's ("NCUDTPA") as provided by N.C. Gen. Stat. § 75-1.1(a).

171.   Defendant owed Plaintiff Pinion and other similarly situated North Carolina purchasers a duty to disclose the defective nature of the Sportsman ATVs because Defendant possessed exclusive and superior information about regarding the manufacture of the products, the complaints received, the testing of the products, and development of repair kits. Defendant could have related information about the defect to customers via its website, product brochures, and through notices provided to its authorized dealers. Defendant's failure to inform consumers of the exhaust heat defect was likely to deceive reasonable consumers.

172.   Defendant also owed a duty to disclose the exhaust heat defect as it presented a safety hazard to riders.

173.   As a result of these unfair and deceptive trade practices Plaintiff Pinion and the North Carolina Class Members have suffered actual injury in that they would not have not purchased their Sportsman ATVs if Defendant had not hid the exhaust heat defect.

174.   In addition, as a result of these unfair and deceptive trade practices, Plaintiff Pinion and the members of the North Carolina Class have suffered actual injury in that they paid more for their Sportsman ATVs because of Defendant's omissions

artificially inflated the purchase price.

175.   Pursuant to N.C. Gen. Stat. § 75-16 and 75-16.1, Plaintiff Pinion and the North Carolina Class Members are entitled to compensatory damages, treble damages, attorney's fees, and costs.

## COUNT IX

### Breach of Implied Warranty of Merchantability
### (By All Plaintiffs under Minnesota Law or By Each Plaintiff for Their Respective State)

176.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 84.

177.   Polaris is and was at all relevant times a merchant with respect to the Polaris Sportsman ATV. Polaris directly sold and marketed its Sportsman ATV to customers through authorized dealers, for the intended purpose of consumers purchasing the vehicles. The ATVs passed from dealer to the Plaintiffs and the Class members without modification to the exhaust system.

178.   Minnesota has adopted the Uniform Commercial Code. A warranty that the Sportsman ATVs were in merchantable quality and condition is implied by law pursuant to state law of each of the states listed herein. MN St. §336.2-314.

179.   If applicable, each of the other states noted in this complaint have also adopted the same provision. *See, e.g.,* CAL. CIV. CODE § 1791(b); Fla. Stat. § 672.103; 810 ILCS 5/2-103, Ill. Rev. Stat., Ch. 26, para. 2-103; Mo. R.S. §400.2-314; N.Y.U.C.C. Law § 2-103; N.C. Gen. Stat. § 25-2-314.

180.   Under the UCC, Plaintiffs and Class members are "buyers", Polaris is a "seller", and its Sportsman ATVs are "consumer goods".

181.   Polaris impliedly warranted to Plaintiffs and the Classes that Sportsman ATVs were "merchantable" meaning it would pass without objection in the trade under the contract description, be of fair average quality within the description, and fit for the ordinary purposes for which such goods are used.

182.   The Sportsman ATVs would not pass without objection in their trade, are not of fair average quality, and are not fit for the ordinary purposes for which it is sold. The ATVs suffer from an exhaust heat defect that melts components, can burn the rider, and makes the ATV uncomfortable to ride and a safety hazard.

183.   The Sportsman ATVs were defective at the time they left the possession of Polaris. The exhaust system was defectively designed as described herein. Polaris knew of this defect at the time it sold the ATVs..

184.   Plaintiffs and Class members have been damaged as a direct and proximate result of Polaris' breach of the implied warranty.

185.   Plaintiffs and Class members have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Polaris or by operation of law in light of Polaris' unconscionable conduct.

186.   Polaris received timely notice regarding the problems at issue in this litigation, both through presentation of Plaintiffs' vehicles at Polaris' dealerships for repair work, and through other multiple customer complaints about the Sportsman ATVs on consumer complaint forums, Polaris ATV forums, and complaints made to the Consumer Product Safety Commission. Notwithstanding such notice, Polaris has failed and refused to offer an effective remedy to the exhaust heat defect.

187.    Plaintiffs and the members of the Class have had sufficient dealings with either Polaris or its agents (authorized Polaris dealers) to establish privity of contract. Notwithstanding this, privity is not required in this case because Plaintiffs and the Class members are intended third-party beneficiaries of contracts of the implied warranty of merchantability.

188.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Polaris limit its implied warranty to the six-month duration of its express warranty would be unconscionable. Polaris' limited warranty was adhesive, and did not permit negotiation, the inclusion of design defects, or the extension of the duration of the implied warranty. Polaris possessed superior knowledge of the defective design of its Sportsman ATVs prior to offering the vehicles for sale. Polaris concealed and did not disclose the exhaust heat defect, and Polaris did not remedy the defect prior to sale (or afterward). Polaris knew that a six-month warranty period was so short that the defect would likely manifest afterward, but within the expected usable lifetime of the ATV. Defendant also knew the exhaust heat defect would recur even after replacing melted components. Any effort by Defendant to limit the duration of the implied warranty—which is imposed by operation of law-- is null and void.

189.    As a result of Defendant's unconscionable conduct and the existence of the exhaust heat defect, Plaintiffs request injunctive relief to nullify the six-month durational limit set out in Defendant's limited warranty.

190.    As a direct and proximate result of Polaris' breach of the implied warranty of merchantability, Plaintiffs and the Class members were caused to suffer economic damage, including repair costs and loss attributable to the diminished value of their

vehicles.

**WHEREFORE,** Plaintiffs request judgment against the Defendant for themselves

and the members of the class as follows:

A.      Certification of the requested Classes pursuant to Fed. R. Civ. P.

23(b)(2) and 23(b)(3);

B.      Restitution of all charges paid by Plaintiffs and the Class;

C.      Disgorgement to Plaintiffs and the Class of all monies wrongfully

obtained and retained by Defendant;

D.      Compensatory and actual damages in an amount according to proof

at trial;

E.      Statutory damages, penalties, treble damages, as provided by law;

F.      Prejudgment interest commencing on the date of payment of the

charges and continuing through the date of entry of judgment in this action;

G.      Costs and fees incurred in connection with this action, including

attorney's fees, expert witness fees, and other cots as provided by law;

H.      Equitable Relief; and

I.      Granting such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial for all issues so triable.

DATED this 31st Day of July, 2017.

Respectfully submitted,

s/Karen Hanson Riebel

Karen Hanson Riebel (#219770)
Kate M. Baxter-Kauf (#392037)

**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: 612-596-4097
Facsimile: 612-339-0981
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com

Theodore J. Leopold (pro hac vice)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:   (561) 515-1401
tleopold@cohenmilstein.com

Andrew N. Friedman (pro hac vice)
Douglas J. McNamara (pro hac vice)
Eric A. Kafka (pro hac vice)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

Robert Gordon, Esq (pro hac vice)
Steven Calamusa, Esq. (pro hac vice)
**GORDON & DONER, P.A.**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
rgordon@fortheinjured.com
scalamusa@fortheinjured.com

**Attorneys for Plaintiffs**