## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RILEY JOHANNESSOHN, DANIEL C. BADILLA, JAMES KELLEY, RONALD KRANS, KEVIN R. WONDERS, WILLIAM BATES, JAMES PINION, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> POLARIS INDUSTRIES INC., <br><br> Defendant. | Case No. 0:16-cv-03348-PJS-LIB <br><br> **MEMORANDUM IN SUPPORT OF POLARIS INDUSTRIES INC.'S MOTION TO AMEND THE PRETRIAL SCHEDULING ORDER TO SET DEADLINES FOR CERTIFICATION DISCOVERY AND MOTIONS AND TO LIMIT INITIAL DISCOVERY TO CERTIFICATION ISSUES** |

### Introduction

Confronted with documents and information that undermine their class allegations and render class certification improbable, the plaintiffs—instead of abandoning the pursuit of certification of their sprawling putative class—are now seeking, in their words, "full-bore" discovery across their entire expansive class. Through informal and formal disclosures, Polaris has already produced volumes of data showing that the plaintiffs' proposed multi-year class of Sportsman ATV owners is unwieldy to the point of incoherence. The class consists of 106 model configurations distinguished by myriad material design differences, including vehicle size, weight, engine size and type, engine configuration, cooling system, and exhaust system. The overwhelming majority of the designs at issue do not present any exhaust-heat risks along the lines alleged in the complaint, and as to the few models that have generated more than a negligible number

of exhaust-heat-related complaints (the named plaintiffs' ATVs fall into this minority),

Polaris is offering enhanced thermal protection through CPSC-approved recalls and

service-advisory campaigns at no cost to customers.

Based on these disclosures, Polaris anticipated that the plaintiffs would agree to

narrow the issues for discovery consistent with Judge Schiltz's guidance at the outset of

the case. During the hearing on Polaris's Rule 12 motion, Judge Schiltz noted the

potential for abusive discovery arising from the fact that the named plaintiffs seek to

pursue claims as to model configurations they've never owned. In this regard, Judge

Schiltz asked the plaintiffs' counsel, "So how is he [Magistrate Judge Brisbois] going to

protect Polaris from having to disclose millions and millions of pages of documents only

to decide what the scope of the class is going to be?" Hr'g Tr. 40:2–5, Feb. 22, 2017

(attached as Ex. 1). The answer to this question, Judge Schiltz suggested, is that before

obtaining discovery on *all* model configurations in the proposed class, it must be shown

that each model configuration has the "same exact" exhaust configuration. *Id.* at 41:11.

"If there's a model that doesn't have that configuration, . . . that takes the model off the

table." *Id.* at 41:15–17.

Rejecting this incremental approach to discovery, the plaintiffs now insist that

Polaris should immediately provide merits discovery not only about every model

configuration in the proposed class of ATVs, but even about model configurations built

years before the start of the proposed class period. Left unchecked, the plaintiffs'

discovery machinations will prevent the requisite *early* ruling on the class-certification

question, while burdening Polaris with undue and disproportionate litigation costs and

2

business disruption. Accordingly, and to ensure a just, speedy, and inexpensive determination of this case, and consistent with Judge Schiltz's comments at the Rule 12 motion hearing, Polaris requests the Court to amend its Pretrial Scheduling Order to establish specific deadlines for the completion of certification-related discovery and motions and to limit initial discovery to matters necessary for the Court to rule on certification.

## Background

### 1.  The plaintiffs' proposed class

The plaintiffs wish to pursue claims on behalf of a sprawling class of purchasers of Polaris ATVs. They contend that every model of Polaris ATV sold under the name *Sportsman* between 2010 and 2016 (excluding 2017 model-year ATVs) suffers a common exhaust-heat defect that can lead to rider discomfort, minor burns, and melted components. Corrected Second Am. Class Action Compl. ("Compl.") (Dkt. 66) ¶¶ 2, 72, 74.

Polaris manufactured dozens of distinct Sportsman ATVs during the proposed class period—ATVs that are materially distinguished in various ways including model, engine configuration, engine size and type, engine-cooling system, size, and weight. *See, e.g.*, *Owner's Manuals*, Polaris.com, http://www.polaris.com/en-us/atv-ranger-rzr/owners-manual (select specific models from drop-down) (last visited Dec. 4, 2017). For example, the dry weight of the 2012 Sportsman 400 and 500 ATVs is 688 pounds, while the 2016 Sportsman 1000 High Lifter weighs 974 pounds—more than 40% heavier. *Compare id.* (select 2012 "Sportsman 400/500 H.O." from drop-down), *with id.*

3

(select 2016 "Sportsman 850/1000 High Lifter" from drop-down). Similarly, while most Sportsman models use coolant to cool the engines and route the exhaust to the right side of the vehicle, the 2010 Sportsman 300 and 400 models feature air-cooled engines and route the exhaust to the left. *See id.* (select 2010 "Sportsman 300" and "Sportsman 400" from drop-down) (noting coolant type); *Part Finder*, Polaris.com, https://atv.polaris.com/en-us/parts/ (select 2010 "Sportsman 300" and "Sportsman 400 HO" from drop-down, and then select "ENGINE, EXHAUST" from drop-down) (last visited Dec. 4, 2017) (depicting a right-side exhaust configuration). Yet despite these and numerous other material differences, the plaintiffs baldly assert that the alleged exhaust-system design and the alleged exhaust-heat defect are "common" to every new Sportsman sold during the six-year putative class period. Compl. ¶ 2.

**2. Polaris's claims data**

Although a small subset of late-model Sportsman ATVs have generated slightly more than a de minimis number of exhaust-heat complaints, Polaris's claims data refute the plaintiffs' sweeping allegations of a common defect across all Sportsman ATVs in the proposed class. In fact, Polaris has received virtually no complaints about excessive exhaust heat as to the vast majority of the implicated Sportsman models. Only three models—the Sportsman 570, 850, and 1000—have slightly elevated claims rates in certain model years, while the rates for the Sportsman 300, 325, 400, 450, 500, 550, and 800 models are close to zero for all putative class model years:



---

[1]   The rates shown in this chart are aggregate across a model family and model year, without distinguishing based on the varying percentages across trim packages even within the same model and model year.



access to a no-cost repair remedy, as discussed below.

Sportsman Class Vehicles: 2009–2016 model year Sportsman Vehicles manufactured, sold and registered in the U.S. (attached as Ex. 2).

Notably, each of the named plaintiffs owns a model that is in a model family that generated an elevated claims rate in at least one model year—a 570, 850, or 1000. None of the named plaintiffs, however, owns a Sportsman in one of the many model families with statistically insignificant numbers of heat complaints.

### 3. Polaris's market actions

As to those few models with slightly elevated claims rates, Polaris has launched CPSC-approved market actions through which customers may obtain enhanced thermal protection for their ATVs. *See* Heat Management Kit Service Advisory FAQ, July 21, 2017 (attached as Ex. 3); Safety Bulletin A-17-01 Field Sales & Dealer FAQ, Mar. 21, 2017 (attached as Ex. 4). Though Polaris announced the market actions over the past seven months, it started working on the issues and communicating with the Consumer Product Safety Commission before the plaintiffs commenced this litigation in October 2016. *See, e.g.*, Polaris Letters to CPSC, Sept. 28, 2016 (attached as Ex. 5).

### a.  Recall campaign for 2015 and 2016 Sportsman 850s and 1000s

On September 28, 2016, Polaris notified the CPSC of a potential thermal-protection issue with the 2015 and 2016 Sportsman 850 and 1000 ATVs. Polaris Letters to CPSC, Sept. 28, 2016 (Ex. 5). In March 2017, with the CPSC's approval, and pursuant to 15 U.S.C. §§ 2051–2084, Polaris issued a recall for these models, sending recall letters to customers and Technical Service Bulletins to dealers. The recall addresses the potential for contact between the exhaust and the exhaust-manifold side panel that could pose burn and fire hazards. Safety Bulletin A-17-01 Field Sales & Dealer FAQ, Mar. 21, 2017 (Ex. 4). The recall work and parts are provided to customers at no cost. *Id.* █████

███████████████████████████████████████████████████████

███████████████████████████████

Due to material design differences within the various Sportsman 850 and 1000 model families, the scope of the recall work varies across the recall population. In fact, as to recall parts and procedures, there are three distinct categories of vehicles within the limited vehicles covered by the recall:

### i.    2015 and 2016 Sportsman 850 and 1000 Touring models

Under the recall bulletin for this group of Sportsman ATVs, old shields are inspected and the exhaust manifold side panel is replaced with a new side panel, which "increases the air gap between the exhaust manifold and exhaust side panel and utilizes a metal heat shield":



Technical Service Bulletin A-17-01-A, at 1, 13–14, Mar. 21, 2017 (attached as Ex. 7).

### ii.    2016 Sportsman 850 and 1000 High Lifter models

Under the bulletin for this group of Sportsman 850 and 1000 ATVs, the same new side panel replaces the original side panel, but the vehicles receive several additional thermal-protection foils and heat shields:



Technical Service Bulletin A-17-01-B, at 31–32, Mar. 21, 2017 (attached as Ex. 8). A new clutch-outlet duct is installed as well. *Id.* at 22.

### iii.  2015 and 2016 Sportsman 850 1-Up and 1000 1-Up models

As with the bulletin for the High Lifters, the recall bulletins for the 1-Up models call for installation of the new side panel and additional thermal-protection foils and heat shields, but they also require an additional foot-well heat shield, an additional clutch-duct heat shield, and if the vehicle was built before January 5, 2015, an exhaust spring retrofit kit (if not completed previously). Technical Service Bulletin A-17-01-C, Mar. 21, 2017 (attached as Ex. 9); Technical Service Bulletin A-17-01-D, Mar. 21, 2017 (attached as Ex. 10); Technical Service Bulletin A-17-01-E, Mar. 21, 2017 (attached as Ex. 11).

### b.  Optional Service Advisory for 2014 to 2017 Sportsman 570s

In July 2017, and with the CPSC's approval, Polaris issued an optional service advisory for 2014 to 2017 Sportsman 570 ATVs. The service advisory authorizes dealers to install a kit that "addresses use scenarios where riders have experienced discomfort

from heat emanating from the engine compartment into the right side foot well area." Service Advisory ASA-17-01A - G, at 1, July 21, 2017 (attached as Ex. 12). The kit remains available to customers at no cost until December 31, 2018. *Id.*

The optional service advisory for the 570 models differs from the work completed under the Sportsman 850 and 1000 recall. The primary repair for 570s involves the installation of "an optional Right Hand Side Panel Close Off Kit that will redirect a portion of the heat produced by the engine and exhaust away from the right hand foot well area." *Id.* at 3. The "close off panel" literally closes an opening into the right-hand foot well area:



Service Advisory ASA-17-01A - G, at 5, July 21, 2017 (Ex. 12). The close-off panel is *not* part of the recall repairs made to the 850 and 1000 models discussed above.

Design differences within the Sportsman 570 model family necessitated unique parts and procedures for the 570 models to which the service advisory applies. Polaris therefore again developed several different update kits and technical service bulletins to support the service advisory, and "[e]ach update kit is specifically designed and tested for a specified group of models/ model years." Service Advisory ASA-17-01A - G, at 1, July

21, 2017 (Ex. 12). There are seven such groups within the overall 2014 to 2017

Sportsman 570 model family covered by the service advisories:

- 2014 and 2015 Sportsman 570 1-UP models (Service Advisory ASA-17-01A, July 21, 2017 (Ex. 13));

- 2014 and 2015 Sportsman 570 Touring, X2, and UTE models (Service Advisory ASA-17-01B, July 21, 2017 (attached as Ex. 14));

- 2016 and 2017 Sportsman 570 1-UP models[2] (Service Advisory ASA-17-01C, July 21, 2017 (attached as Ex. 15));

- 2015 and 2016 Sportsman 570 Touring, X2, and UTE models (Service Advisory ASA-17-01D, July 21, 2017 (attached as Ex. 16));

- 2015 Sportsman 570 EU Quadricycle 1-UP models (Service Advisory ASA-17-01E, July 21, 2017 (attached as Ex. 17));

- 2016 Sportsman 570 EU Quadricycle 1-Up models (Service Advisory ASA-17-01F, July 21, 2017 (attached as Ex. 19));

- 2016 Sportsman 570 EU Quadricycle Touring models (Service Advisory ASA-17-01G, July 21, 2017 (attached as Ex. 20)).

All of these kits involve the installation of right-hand close-off panels—which

themselves differ depending on the specific model configuration at issue—but earlier

models also receive a new fuel-tank foil that had been introduced as a design change for

later models, namely, the 2016 and 2017 model-year 570s. *Compare* 2014–2015

---

[2]   This group also includes the 2016 to 2017 Sportsman 450HO.

Sportsman 570 Touring X2, and UTE Heat Management Kit, at 4–5, July 18, 2017

(attached as Ex. 14), *with* 2016–2017 Sportsman 450/570 1-Up Heat Management Kit, at

1–5, July 18, 2017 (attached as Ex. 15).

### 4. A remedy for each named plaintiff

Though they seek to represent the owners of all Sportsman ATVs sold from 2010

through 2016, the named plaintiffs' ATVs are 2015 and 2016 model-year vehicles, and

each of the named plaintiff's ATVs is subject to either the recall or the service advisory.

Thus, each named plaintiff has access to a no-cost repair of the alleged defect over which

he's suing Polaris. While some of the plaintiffs have had either the recall or service

advisory work performed, others have not. *See* Named Plaintiffs' Market-Action

Completion Summary Chart (attached as Ex. 20) (identifying whether the applicable

market action has been performed as to the named plaintiffs' ATVs).

### 5. Polaris's voluntary informal disclosures to the plaintiffs

Following an informal in-person conference in May 2016, at the time of the

pretrial conference in July 2017, the parties were discussing a framework for an informal

exchange of information to facilitate discussions to explore possibilities for resolving the

case. Polaris ultimately agreed to provide voluminous pre-discovery disclosures. From

July 27 to August 23, 2017, Polaris made four voluntary document productions to the

plaintiffs. Among other things, Polaris produced the claims data discussed above, as well

as service bulletins, customer letters, and engineering drawings for the recall and service

advisory. As to the recall, Polaris also produced copies of communications with the

CPSC.

### 6.  Polaris's formal discovery disclosures to the plaintiffs

Despite Polaris's considerable informal-discovery efforts, which showed that exhaust-heat issues existed for only a small subset of Sportsman ATVs within the putative class, and that those ATV owners have a no-cost repair remedy, the plaintiffs announced their intent to proceed with formal discovery. To that end, they demanded responses to formal discovery requests, and later served a notice for a Rule 30(b)(6) deposition. Pl.'s First Interrogs., July 18, 2017 (attached as Ex. 21); Pl.'s First Req. for Produc. of Documents, July 18, 2017 (attached as Ex. 22); Pl.'s Not. of Taking Dep., Oct. 31, 2017 (attached as Ex. 23).

Though the plaintiffs' written discovery requests delved into the merits of the case, Polaris responded in writing and produced documents. Among other things, Polaris produced a spreadsheet of all heat-related claims for the ATV models in the plaintiffs' proposed class. The spreadsheet contains 426,308 lines of information concerning all 2009 to 2016 model-year Sportsman ATVs. It also provides exactly 5,700 lines of highly detailed information about each heat-related claim, including all call notes, e-mails, and communications from customers or dealers regarding each claim housed in its Customer Relations Management ("CRM") and warranty databases. Beyond the detailed claims spreadsheet, Polaris produced a wide variety of information, such as marketing and testing documents. It also produced numerous engineering drawings and agreed to produce additional drawings, if requested. And as to the Rule 30(b)(6) notice, Polaris agreed to produce one or more witnesses for deposition at the time the plaintiffs requested.

In total, through informal and formal discovery, Polaris has already produced 1.48 gigabytes of information—the eDiscovery equivalent of 74,000 to 111,000 pages of documents.

### 7. The plaintiffs' demands for further discovery

Despite the substantial informal and formal discovery already provided, the plaintiffs demanded additional onerous discovery from Polaris, announcing during a recent telephone conference that they plan to conduct "full-bore" discovery. In particular, they are demanding broad eDiscovery, including searches of Polaris employees' e-mails and personal electronic document folders. In a single interrogatory, the plaintiffs asked Polaris to identify all persons responsible for the following wide range of company activities: (1) "[d]esigning the exhaust system and validating the design" for each of the dozens of Sportsman models at issue; (2) "[m]arketing the Sportsman ATV" across all of the models at issue; (3) "warranty fulfillment on the Sportsman ATV"; (4) "communicating with Sportsman ATV customers about warranty claims or other questions"; (5) "designing the Seat Retention Kit, the Heat Shield Kit, and validating the design"; and (6) "communicating with customers on websites." Pls.' Interrogs. # 4 (attached as Ex. 21). The plaintiffs not only want eDiscovery as to each such person's custodial documents, but they also apparently intend to depose all of these personnel. T. Leopold Letter to P. Cereghini at 3, Oct. 19, 2017 (attached as Ex. 24).

Moreover, even though the discovery parameters are already quite expansive due to the vast size of the proposed class, the plaintiffs want Polaris to provide information about vehicles outside of the class—vehicles manufactured prior to the 2010 model

14

year—on the vague theory that "there has long been an exhaust heat problem." D.

McNamara E-mail to M. Novacheck, Nov. 13, 2017 (attached as Ex. 25).

The plaintiffs are making these expansive discovery demands without

demonstrating that the requested information is relevant, let alone necessary, to class

certification. And they apparently have no intention of moving on class certification until

they complete discovery on the merits.

### 8.  Polaris's effort to meet and confer on discovery issues

Polaris has participated in multiple, lengthy telephone calls regarding the

plaintiffs' criticisms of Polaris's discovery responses. Polaris has discussed the issues

professionally and in good faith and provided supplemental responses, where reasonable.

Polaris provided information even on merits issues when the burden was not

unreasonably significant.

When Polaris attempted to meet and confer with the plaintiffs regarding its

suggestion that initial discovery should focus on class-certification issues and that the

parties should agree to a deadline for class-certification motions, the plaintiffs rebuffed

both proposals. Instead, the plaintiffs responded that because discovery had not been

formally bifurcated between merits and class discovery, they intended to insist on

pursuing everything now.

## Argument

**To ensure a prompt ruling on class certification and protect Polaris from undue discovery burdens, the Pretrial Scheduling Order should be amended to set deadlines for certification-related discovery and motions, and to tailor initial discovery as much as reasonably possible to class-certification issues.**

A pretrial scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(a)(4). As has been found in numerous courts—including in this district—good cause exists here for amending the Pretrial Scheduling Order to establish early deadlines for the completion of certification discovery and the filing of certification motions and to limit pre-certification discovery to certification-related issues. These modifications would permit the Court to decide at "an early practicable time" whether the case will proceed as a class action. Fed. R. Civ. P. 23(c)(1)(A). Such modifications would also serve to protect Polaris from undue burden by preventing full-bore merits discovery of a putative class that has not been—and in Polaris's view, cannot be—certified for class adjudication.

Further, because Polaris's proposed additions to the Pretrial Scheduling Order would not affect the deadline for dispositive motions, they would cause no delay and would instead further the case-management objectives of Rule 16, including to expedite disposition, avoid protracted proceedings, and discourage wasteful pretrial activities. Fed. R. Civ. P. 16(a)(1)–(3). For all these reasons, the Court should grant this motion.

**A. To facilitate the requisite early decision on whether the case may proceed as a class action, courts frequently set early deadlines for certification-related discovery and motions and limit early discovery to certification-related issues.**

Under Rule 23 of the Federal Rules of Civil Procedure, the Court must determine "at an early practicable time" whether to certify the case as a class action. Fed. R. Civ. P. 23(c)(1)(A). "The reason for this rule is plain: fundamental fairness requires that a defendant named in a suit be told promptly the number of parties to whom it may ultimately be liable for money damages." *Siskind v. Sperry Ret. Program, Unisys*, 47 F.3d 498, 503 (2d Cir. 1995) (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, 1412 (D.C. Cir. 1984)). As Judge Easterbrook succinctly put it, when it comes to whether to certify a class, "[p]rompt decision is essential." *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 455 (7th Cir. 2007).

To enable a prompt decision on class certification, "active [case] management may be necessary." Fed. R. Civ. P. 23, advisory committee's note (2003 amendments). To that end, courts frequently take at least two concrete steps to facilitate an early ruling: establishing certification-related deadlines, and phasing discovery to focus initially on certification.

As to certification deadlines, courts often require that parties complete class-certification discovery and motions well in advance of the general discovery cut-off and the deadline for dispositive motions. In some jurisdictions, the local rules establish a deadline that applies to every class action. For example, in the Central District of California, the local rules require that parties file their certification motions within ninety

17

days of commencement of the action. Central Dist. Cal. Local Civ. R. 23-3. Courts in

Utah, Georgia, Texas, and Louisiana have similar rules. Dist. Utah Local Civ. R. 23-1(d);

N.D. Ga. Local Civ. R. 23.1(B); N.D. Tex. Local Civ. R. 23.2; E.D. La. Local Civ. R.

23.1(B).

Alternatively, courts—including in this district—frequently impose certification

deadlines on a case-by-case basis through their scheduling orders. For instance, in

*Gewecke v. U.S. Bank, N.A.*, the scheduling order initially did not impose certification

deadlines, but after denying the plaintiff's motion to compel because his discovery

requests exceeded the permissible scope of pre-certification discovery, *Gewecke v. U.S.*

*Bank, N.A.*, No. 09-1890 (JRT/LIB), 2012 WL 12896249, at *5 (D. Minn. June 1, 2012),

the court amended the scheduling order to require the parties to complete certification

discovery and motions approximately six months prior to the general discovery cut-off,

*Gewecke v. U.S. Bank, N.A.*, No. 09-1890 (JRT/LIB), at 2–5 (D. Minn. Oct. 5, 2012),

ECF No. 167 (attached as Ex. 26).

As to limiting initial discovery to certification issues, the Advisory Committee's

comments to Rule 23 expressly recommend that, prior to certification, litigants in a

putative class action should "conduct controlled discovery into the 'merits,' limited to

those aspects relevant to making the certification decision on an informed basis.'" Fed. R.

Civ. P. 23, advisory committee's note (2003 amendments). Considerable decisional

authority—again, including in this district—supports this approach. *See, e.g.*, *Washington*

*v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1571 (11th Cir. 1992) ("To make

early class determination practicable and to best serve the ends of fairness and efficiency,

courts may allow classwide discovery on the certification issues and postpone classwide

discovery on the merits."); *Cox v. Zurn Pex, Inc.*, No. 07-3652 (ADM/RLE), at 8, 10,

Oct. 26, 2007, ECF No. 22 (attached as Ex. 27) (denying the plaintiff's motion for single-

phase discovery and ordering the parties to "engage in focused discovery, on the issue of

class certification"); *Del Campo v. Kennedy*, 236 F.R.D. 454, 459 (N.D. Cal. 2006)

("Prior to certification of a class action, discovery is generally limited and in the

discretion of the court."); *Larson v. Burlington N. & Santa Fe Ry.*, 210 F.R.D. 663, 666

(D. Minn. 2002) (limiting the first phase of discovery to class-certification issues).

In many instances, courts formally bifurcate discovery between certification and

merits issues. In such cases, the initial phase of discovery is strictly limited to

certification issues, with merits discovery entirely off-limits. *See In re Zurn Pex*

*Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (noting that the district

court bifurcated discovery and that "there is little doubt that bifurcated discovery may

increase efficiency in a complex case")[3]; Manual for Complex Litigation § 21.14 (4th ed.

2017) ("Courts often bifurcate discovery between certification issues and those related to

the merits of the allegations.").

In other cases, courts eschew formal bifurcation, citing the sometimes hazy line of

demarcation between certification and merits discovery. *See Johnson v. Bobcat Co.*, No.

15-cv-02097 (JRT/HB), at 2–3 (D. Minn. May 26, 2016), ECF No. 55 (attached as Ex.

28) (noting that the court was "not persuaded that, in the circumstances of this case, there

---

[3]   The Court noted that bifurcated discovery may lead to "gaps in the available
     evidence" at the certification stage, but it did not suggest that this possibility counsels
     against bifurcation. *Zurn*, 644 F.3d at 613.

is a sufficiently clear distinction to be made in the scope of discovery relevant to the respective phases"); Manual for Complex Litigation § 21.14 (4th ed. 2017) ("There is not always a bright line between the two."). But even without bifurcating, courts often preclude plaintiffs from engaging in free-wheeling merits discovery prior to certification. Magistrate Judge Bowbeer's analysis in *Johnson v. Bobcat Co.* illustrates this approach. While unconvinced that bifurcation would prove workable, Judge Bowbeer ordered the parties to "work together to prioritize discovery that will be necessary for the class certification decision and to defer discovery that would not be relevant (or, even if arguably relevant, would not be proportional to the needs of the case) unless a class is certified." *Johnson*, No. 15-cv-02097 (JRT/HB), at 2–3. Thus, while not categorically precluding merits discovery, Judge Bowbeer required the parties to direct their energies toward swiftly preparing the record for the court to address certification.

**B. Here, because the plaintiffs will not agree informally to a reasonable schedule for class versus merits discovery and class-certification motions, the Court should amend the Pretrial Scheduling Order to prevent undue delay of a ruling on class certification.**

The current Pretrial Scheduling Order relies on the parties' cooperative efforts to submit the class-certification issue for a reasonably prompt ruling. The order does not bifurcate discovery. Pretrial Scheduling Order, July 31, 2017 (Dkt. 63). Nor does it establish a specific deadline for motions to grant or deny certification. *Id.* Instead, the order grants the parties wide berth to complete their pretrial work, provided that all discovery must cease by August 24, 2018, and dispositive motions must be filed by April 1, 2019. *Id.* ¶¶ I, X.

20

When the Court entered the Pretrial Scheduling Order, the parties were engaged in informal exchanges of information. Polaris therefore felt confident that the parties would work together within the broad parameters of the scheduling order to efficiently narrow the issues and develop a record for a prompt decision on class certification, if necessary.

But after Polaris provided substantial informal discovery, the plaintiffs signaled their intent to press ahead with expansive formal discovery prior to moving on class certification. The plaintiffs further communicated that they are not amenable to focusing initial formal discovery on class-certification issues, and oppose submitting the class-certification question for early decision.

In sum, it is apparent that absent Court directives to the contrary, the plaintiffs intend to engage in protracted and costly merits discovery, and only at the end of that arduous process to move for certification. Because the plaintiffs' approach to discovery and certification briefing would delay a ruling on certification until close to the eve of trial, the Pretrial Scheduling Order should be amended to impose discovery deadlines and phases consistent with the early-practicable-time mandate of Rule 23.[4] *See* Fed. R. Civ. P. 23, advisory committee's note (2003 amendments) ("Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.").

---

[4] The plaintiffs doubtless will bemoan that distinguishing between certification- and merits-related discovery may prove taxing, but the sometimes "hazy line that separates class-certification questions and merits inquiries does not eliminate the benefit of bifurcating discovery." *St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, No. 6:12-cv-739, 2013 WL 12214144, at *2 (E.D. Tex. Nov. 25, 2013).

**C. By amending the Pretrial Scheduling Order to advance a ruling on class certification, the Court would also protect Polaris from discovery burdens that should be borne only in the unlikely event that a class is certified.**

In addition to developing the record for prompt resolution of the class question, phased discovery also serves to protect defendants from undue burden. Under Rule 26 of the Federal Rules of Civil Procedure, the scope of discovery must be "proportional to the needs of the case." Fed. R. Civ. P. 23(b)(1). When the case is a putative class action, the scope of permissible discovery is often "critically impacted by the District Court's resolution of the certification issue." *Larson v. Burlington N. & Santa Fe Ry.*, 210 F.R.D. 663, 666 (D. Minn. 2002). Discovery that might ultimately prove reasonable if a class were certified may nevertheless be denied prior to certification because "unfettered discovery prior to class certification could be both extensive and expensive, and could impose vastly asymmetrical burdens on Defendant." *Johnson v. Bobcat Co.*, No. 15-cv-02097 (JRT/HB), at 2 (Ex. 28). Thus, by limiting initial discovery to certification-related issues, courts ensure that defendants will not bear the heavy burden of class discovery unless and until it's warranted. *See, e.g.*, *Gewecke*, 2012 WL 12896249, at *5 (prohibiting pre-certification merits discovery that "would be unduly burdensome at this time prior to a successful motion for class certification").

Courts have evinced particular concern about the burdens of pre-certification discovery when certification appears untenable. Magistrate Judge Raymond Erickson's analysis in *Larson v. Burlington Northern & Santa Fe Railway* is instructive in this regard. As Polaris does here, the defendant in *Larson* moved the court to bifurcate

discovery, "so as to focus on class-related discovery in preparation for a class certification Motion, before an exhaustive exploration of the merits of the class action." *Larson*, 210 F.R.D. at 664. And as the plaintiffs do in this case, the plaintiffs in *Larson* opposed bifurcation, apparently hoping to defer the certification question "until the cases approache[d] a Trial." *Id.* at 665. In granting the motion to bifurcate, Judge Erickson relied, in part, on his assessment that the plaintiffs would face great odds on class certification: "While, at this preliminary stage, we cast no projections as to the potential success of a certification Motion, the claim alleged by the Plaintiffs is potentially fraught with factual distinctions which could render certification problematic." *Id.* at 666.

As in *Larson*, there is ample reason here for skepticism of the plaintiffs' pursuit of class treatment, and therefore ample reason to defer burdensome merits discovery until the Court has an opportunity to rule on certification. *First*, the proposed class of all Sportsman ATVs sold from 2010 through 2016 includes a wide range of vehicle designs, with material design differences that bear directly on heat generation—including vehicle size, engine size, engine configuration, exhaust-system routing, emissions standards, cooling-system design, and so on. The effects of these differences are not merely hypothetical: The claims information that Polaris produced demonstrates that different vehicle designs yield varying levels of heat-related claims and complaints. And Polaris's market actions underscore that, where the potential for exhaust-heat issues exists, the appropriate corrective action will vary from vehicle configuration to vehicle configuration—even within the same model and model year.

In view of the numerous significant design differences, the plaintiffs could not possibly prove a common defect across the entire putative class through common evidence. The jury could not, for example, assess the reasonableness of the exhaust-heat management of a 550-pound Sportsman 300 equipped with an air-cooled engine and left-side exhaust based on evidence about the design of a 974-pound Sportsman 1000 High Lifter with a liquid-cooled engine and right-side exhaust. In short, materially diverse product designs preclude the commonality required for class adjudication. *See, e.g.*, *Johnson v. Harley-Davidson Motor Co.*, 285 F.R.D. 573, 580 (E.D. Cal. 2012) (finding that the plaintiffs could not prove an engine-heat defect with common proof because the heat generated across the "more than 130 configurations" of motorcycles in the proposed class would depend on various factors, such as engine size, the design of the exhaust components and air filter, and engine calibration); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (reversing certification of a class of six different automobile tire "trade names" based, in part, on the fact that the six trade names comprised 67 master tire specifications of different widths, diameters, and tread designs and "therefore it would not be possible to make a once-and-for-all decision" as to defect across all 67 specifications).

*Second*, as to those few models and model years of Sportsman ATVs with notable rates of heat-related claims, Polaris's recall and service advisory provide each affected owner a no-cost remedy. Even assuming that the existence of a no-cost recall remedy is not fatal to the plaintiffs' claims outright, *see Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1215 (10th Cir. 2012) (holding that the manufacturer's recall to correct an

issue rendered moot a putative class action based on the same issue), the availability of a recall weighs heavily against certification. For example, among the prerequisites to certification of a class under Rule 23(b)(3) is the requirement that class adjudication "is superior to other available methods for fairly and efficiently adjudicating the controversy." But as numerous courts have held, class adjudication is an *inferior* method when the class members have a readily available recall remedy. *See, e.g.*, *Daigle v. Ford Motor Co.*, No. 09-3214, 2012 WL 3113854, at *5 (D. Minn. July 31, 2012) (ruling that class litigation did "not appear to be a superior method" for adjudication because a recall provided "most of the putative class the relief it seeks"); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 (D.N.J. 1998) (same).

Just as in *Larson*, there are substantial impediments to certification in this case, and in view of those obstacles, it would be particularly unreasonable for Polaris to incur the costs of full merits discovery prior to a ruling on class certification.

Furthermore, prioritizing certification-related discovery would go a long way toward addressing the concerns Judge Schiltz expressed about the need to protect Polaris from "having to disclose millions and millions of pages of documents only to decide what the scope of the [putative] class is going to be." Hr'g Tr. 40:2–5, Feb. 22, 2017 (Ex. 1). Phased discovery that focuses initially on certification issues would be entirely consistent with the incremental approach to discovery that Judge Schiltz suggested at the Rule 12 hearing. *See id.* at 41:7–13 (recommending that the Court preclude discovery as to models that do not have the exact same configuration as the named plaintiffs' ATVs).

Accordingly, to guard against unduly burdensome discovery, the Court should amend the scheduling order to defer merits discovery until after the Court determines whether to certify a class.

### Conclusion

Without court intervention, the plaintiffs' approach to this litigation would postpone a ruling on class certification until essentially the eve of trial, and in the meantime, and inconsistent with the rules, their Advisory Committee comments, and rulings from numerous courts including this one, Polaris would continue to face burdensome demands for discovery—discovery that would be judged irrelevant and disproportionate if, as Polaris fully expects, certification is ultimately denied. To prevent untoward delay and abusive discovery, Polaris requests the Court to grant its motion to amend the Pretrial Scheduling Order to set certification-related deadlines and to limit initial discovery to issues bearing on certification.

Respectfully submitted,

Date: December 4, 2017.

s/Nathan J. Marcusen
Paul G. Cereghini (pro hac vice)
BOWMAN AND BROOKE LLP
2901 North Central Avenue, Suite 1600
Phoenix, AZ  85012
Telephone:  (602) 643-2300
Fax:  (602) 248-0947
paul.cereghini@bowmanandbrooke.com

Mary T. Novacheck (#0184792)
Nathan J. Marcusen (#0386875)
Isaac W. Messmore (#0393276)
BOWMAN AND BROOKE LLP
150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Telephone:  (612) 339-8682
Fax:  (612) 672-3200
nathan.marcusen@bowmanandbrooke.com
ike.messmore@bowmanandbrooke.com

Robert L. Wise (pro hac vice)
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA  23219
Telephone:  (804) 649-8200
Fax:  (804) 649-1762
rob.wise@bowmanandbrooke.com

*Attorneys for Defendant*