# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RILEY JOHANNESSOHN, et al., | Case No. 16-CV-3348 (NEB/LIB) |
| Plaintiffs, | |
| v. | ORDER |
| POLARIS INDUSTRIES, INC., | |
| Defendant. | |

Plaintiffs bring this action under the laws of six states on behalf of a putative class of all-terrain vehicle ("ATV") buyers. They claim that Defendant Polaris Industries, Inc. omitted material facts about an alleged defect at the time they purchased their Sportsman ATVs. Fact and expert discovery have now closed. Plaintiffs move for class certification, and Polaris moves to strike certain of Plaintiffs' expert opinions and for summary judgment on the named Plaintiffs' claims.[1]

## BACKGROUND

The Court draws the following background facts from the summary judgment record, viewing the evidence in the light most favorable to the Plaintiffs. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).

---

[1] Polaris requested permission to file a *Daubert* motion in connection with its class certification motion (ECF No. 321) and Plaintiffs did not object, except with respect to word limits in the briefing. (ECF No. 322.) The Court granted the request. (ECF No. 323.) Polaris then filed a motion for summary judgment. (ECF No. 356.) The Court heard oral argument on all motions together.

Polaris, headquartered in Medina, Minnesota, manufactures recreational vehicles, such as ATVs and motorcycles. (ECF No. 340-2 at 23:17–19.) Polaris's ATVs include the Sportsman 450, 570, 850, and 1000. (ECF No. 370 ("Dahl Decl.") ¶¶ 3–4.) The Sportsman 450 and 570 ATVs have smaller single cylinder engines; the Sportsman 850 and 1000 ATVs have larger dual cylinder engines. (*Id.* ¶ 6.)

As early as 2007, Polaris faced consumer complaints about excessive heat in some of its ATVs. In 2014, the U.S. Consumer Production Safety Commission ("CPSC") opened an investigation in response to reports of several ATV fires. Over the course of that investigation, the CPSC made the preliminary determination that Polaris MY2015-16 Sportsman 850 ATVs present "a substantial product hazard" under 15 U.S.C. § 2064(a), noting that "the right hand side heat shield is in close proximity to, and in some cases makes contact with [the] exhaust manifold, posing a burn and fire hazard." (ECF No. 336-23 at 2.) The CPSC requested that Polaris voluntarily recall or correct the potentially hazardous Sportsman 850 ATVs. (*Id.* at 3.) In March 2017, Polaris issued a recall for MY2015-16 Sportsman 850s and 1000 ATVs. (ECF No. 336-24.) Polaris informed consumers that it had developed a new exhaust manifold side panel that "significantly increases the air gap between the exhaust manifold and exhaust manifold side panel and utilizes a metal heat shield." (ECF No. 336-25.)

The CPSC's investigation also sought information about Polaris's Sportsman 570s. (ECF No. 336-22.) Following the investigation, Polaris issued a service advisory in July

2017 offering an "optional Right Hand Side Panel Close Off Kit that will redirect a portion of the heat produced by the engine and exhaust away from the right hand foot well area" for MY2016-17 Sportsman 450s and MY2014-17 Sportsman 570s. (ECF No. 336-26.)

Plaintiffs in this case are Sportsman ATV owners Riley Johannessohn, Daniel C. Badilla, James Kelley, Kevin R. Wonders, William Bates, and James Pinion (collectively, "Plaintiffs").[2] Their Corrected Second Amended Complaint ("Complaint") pleads that Polaris violated the consumer protection laws of Minnesota, California, Florida, Missouri, New York, and North Carolina by failing to disclose the Sportsman line's exhaust heat problems, causing Plaintiffs to suffer injury. (ECF No. 66 ("SAC") ¶¶ 85–175.) The Complaint alleges that "Polaris'[s] omissions artificially inflated the market price for the ATVs" when Polaris "could have and should have warned customers" about what the Complaint refers to as an "exhaust heat defect." (*Id*. ¶ 4.) Plaintiffs now seek to certify a nationwide class of consumers who purchased new MY2011-16 Polaris Sportsman 850s, MY2015-16 Sportsman 1000s, MY2014-17 Sportsman 570s, and MY2016-17 Sportsman 450s (the "Class Vehicles") from October 4, 2010 to the present. (ECF No. 335 at 1 n.1.) In the alternative, they seek to certify six statewide classes for Class Vehicle owners in the states of Minnesota, Florida, California, Missouri, New York, and North Carolina. (*Id.* at 18–19.) Polaris moves for summary judgment on all claims asserted against it in the

---

[2] The Second Amended Complaint also includes Plaintiff Ronald Krans, a resident of Illinois. His claims have been dismissed from the case. (ECF No. 143.)

Complaint. (ECF No. 356.) Polaris also seeks to exclude the expert testimony of Richard Eichmann and Sara Butler. (ECF No. 371.) For the reasons discussed below, all three motions—for summary judgment, for exclusion of expert testimony, and for class certification—are denied.

## SUMMARY JUDGMENT

### I.    Choice of Law

To assess Plaintiffs' claims, the Court must first decide what law applies to them. This task requires a choice-of-law analysis, complex here because Plaintiffs are from six states, each with its own consumer protection statute or statutes. Plaintiffs contend that the Minnesota Consumer Fraud Act should apply to the consumer fraud claims of all plaintiffs, regardless of their state of residence. *See* Minn. Stat. § 325F.68 *et seq.* ("MCFA"). A federal court sitting in diversity applies the choice-of-law rules of the forum state where it sits—here, Minnesota's choice-of-law rules. *Highwoods Props., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 920 (8th Cir. 2005). In determining if the MCFA can apply extraterritorially, Minnesota courts apply a multistep analysis. The court first determines whether an outcome-determinative conflict exists. *Jepson v. Gen. Cas. Co. of Wisc.*, 513 N.W.2d 467, 469–70 (Minn. 1994); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) ("St. Jude I"). If a conflict exists, the court determines whether the law of both states can be constitutionally applied. *Jepson*, 513 N.W.2d at 469. If it is constitutionally permissible for the forum state to apply its laws, the court then considers five factors to

determine whether to apply the forum state law. *Id.* at 470. For the reasons that follow, the Court concludes that each Plaintiff's claims are governed by the state in which he resides.

## A. Application of the MCFA: Outcome-Determinative Conflicts

The Complaint alleges that Polaris violated the consumer protection laws of Minnesota, California, Florida, Missouri, New York, and North Carolina, thereby injuring Plaintiffs and other consumers who reside in those states. Plaintiffs maintain that because the consumer protection laws of these states do not conflict with the MCFA, the Court can apply the MCFA to all claims.[3]

The parties focus their briefs on the requirements of reliance or causation and scienter under each state's consumer protection statute or statutes. In doing so, both Plaintiffs and Polaris refer to tables appended to their briefs.[4] Plaintiffs bear the burden

---

[3] In *In re St. Jude*, the district court concluded that the consumer protection laws of 32 jurisdictions did not have outcome-determinative conflicts with Minnesota. No. 01-CV-1396 (JRT/FLN), 2006 WL 2943154, at *5 & n.3 (D. Minn. Oct. 13, 2006), *rev'd and remanded on other grounds*, *In re St. Jude Med., Inc.* ("*St. Jude II*"), 522 F.3d 836 (8th Cir. 2008). That court relied on the plaintiffs' analysis to find no conflicts among certain state consumer protection laws, including the six states forming the basis of Plaintiffs' claims here. *Id.* at *5. This Court has conducted its own analysis of the consumer statutes at issue and comes to a different conclusion based on the facts of this case.

[4] Polaris submitted a detailed table analyzing state consumer protection statutes in support of the argument that the laws conflict. (ECF No. 367-1 ("Polaris App. A").) Plaintiffs respond with a much simpler table indicating "yes" or "no" to four questions about each state's consumer protection statute: whether a private cause of action exists, whether scienter is required, whether individual reliance is required, and whether material omissions are prohibited. (ECF No. 336-2 ("Pls' Tab C").) These four issues were identified as outcome-determinative conflicts for the consumer protection statutes. *In re*

of fully analyzing the law of the jurisdictions whose laws may apply to the putative class's claims; it is not Polaris's burden to prove an outcome-determinative conflict exists. *See Thompson v. Allianz Life Ins. Co. of N. Am.*, 330 F.R.D. 219, 223 (D. Minn. 2019). Below, the Court addresses the six state consumer-protection laws and their requirements as to reliance or causation and scienter. Such an analysis is necessary before the Court can compare each state's laws against the MCFA to reach the conflicts issue.

### 1. Minnesota

The Complaint alleges that Polaris violated the MCFA by omitting material information regarding the Sportsman ATVs' exhaust heat defect, thereby injuring Plaintiff Riley Johannessohn and other purchasers.[5] (SAC Count I.) The MCFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise." Minn. Stat. § 325F.69, subd. 1. A private plaintiff suing for an MCFA violation must prove that "the defendant engaged in conduct prohibited by the statutes and that the plaintiff was damaged thereby." *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001); *see also*

---

*St. Jude*, 2006 WL 2943154, at *5 n.4. Polaris argues that the states' consumer protection statutes also differ on the requirements of the duty to disclose omissions, materiality, and causation. Plaintiffs address these requirements in summary fashion, asserting that they are not outcome-determinative in the context of this case.

[5] The injury claimed by Plaintiffs is economic, not physical.

*Wexler v. Bros. Entm't Grp., Inc.*, 457 N.W.2d 218, 221 (Minn. Ct. App. 1990) (to prevail on

an MCFA claim, a plaintiff must prove that the defendant violated Minn. Stat. § 325F.69

and that the plaintiff "was injured in some way by the violation"). For an MCFA claim

based on an omission, a plaintiff must prove an omission of material fact, as well as

special circumstances that trigger a duty to disclose. *Graphic Commc'ns Local 1B Health &*

*Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 696 (Minn. 2014).[6]

a.    Causation under the MCFA

Under the MCFA, a plaintiff need not prove traditional common law reliance. *Grp.*

*Health*, 621 N.W.2d at 13. Rather, he or she must establish a causal nexus between the

conduct alleged to violate the MCFA and the damages claimed, which can be proved by

circumstantial evidence. *Id.* at 4, 14. In *Group Health*, the Minnesota Supreme Court noted

that an element of individual reliance is embedded in the causal nexus requirement

because a fraudulent or misleading statement cannot by its nature cause harm unless the

---

[6] Special circumstances triggering a duty to disclose include: (a) one who speaks must say enough to prevent his words from misleading the other party; (b) one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party; and (c) one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 421 (1972); *see also Graphic Commc'ns*, 850 N.W.2d at 695–98 (citing *Klein*, 293 Minn. at 421). The parties do not dispute that Polaris had a duty to disclose the exhaust heat defect. *See Johannessohn v. Polaris Indus., Inc.*, No. 16-CV-3348 (PJS/LIB), 2017 WL 2787609, at *4 (D. Minn. June 27, 2017) ("Polaris does not argue that it lacks a duty to disclose, and *Graphic Communications* is therefore not relevant.").

statement "had some impact on" inducing the individual plaintiff's actions. *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 141 (Minn. 2019) (quoting *Grp. Health*, 621 N.W.2d at 14).

Polaris claims that a causal nexus under Minnesota law cannot be presumed, but instead must be proved through evidence for each purchaser. It cites *Buetow v. A.L.S. Enterprises, Inc.*, for the proposition that "[w]hen the plaintiffs are consumers who have proved no future harm . . . it is an error of law to *assume* that a false statement materially deceived and injured the plaintiffs." 650 F.3d 1178, 1183 (8th Cir. 2011) (emphasis in original). The Court finds *Buetow* distinguishable because there, the plaintiffs sought only injunctive relief without presenting any evidence of a risk of future harm. *See id.* at 1182, 1185 (explaining that *Group Health* "requir[es] a private plaintiff seeking injunctive relief for violations of [MCFA] to prove harm or injury-in-fact"). Polaris also relies on the Minnesota Court of Appeals' decision in *State v. Minnesota School of Business, Inc.*, which held that particular students' testimony that the defendant school's conduct harmed them could be not used to presume a causal nexus for non-testifying students. 915 N.W.2d 903, 911–13 (Minn. Ct. App. 2018). But this holding was recently reversed in *State v. Minnesota School of Business, Inc.*, 935 N.W.2d 124 (Minn. 2019). In its opinion, the Minnesota Supreme Court discussed *Group Health*, and reiterated that "direct proof of reliance is not required to establish a causal nexus" under the MCFA. *Id.* at 137. "[W]here a defendant's misrepresentations were directed at and affected a broad group of consumers, proof of direct individual reliance is not required to establish a causal nexus

between MCFA violations, and the harm suffered by consumers." *Id.* at 135 (citing *Grp. Health*, 621 N.W.2d at 14–15). The court noted that while "individualized direct proof of reliance is not necessary in an MCFA damages case," "there are times when the materiality and pervasiveness of consumer fraud is relevant to support a court's finding that a causal nexus exists between the fraud and the consumer's decision to purchase the product." *Id.*

In Minnesota, a defendant has a chance to rebut evidence of causation presented by the plaintiffs. In *St. Jude II*, the Eighth Circuit explained that "[w]hatever *Group Health* means about the need for these plaintiffs to present direct evidence of individual reliance, it does not eliminate the right of a defendant to present evidence negating a plaintiff's direct or circumstantial showing of causation and reliance." 522 F.3d at 840. The *St. Jude II* court found that the defendant had presented evidence concerning the reliance or non-reliance of individual physicians and patients on representations made by the defendant, and held that where the defendant was able to present such evidence, the resolution of the defendant's potential liability to each plaintiff under the consumer fraud statutes would be dominated by individual issues of causation and reliance. *Id.* at 839–40 (reversing certification of an MCFA class).[7] Here, Polaris argues that it will introduce

---

[7] The recent decision in *State v. Minnesota School of Business* does not address a defendant's ability to negate a plaintiff's direct or circumstantial showing of causation and reliance under the MCFA.

rebuttal evidence to disprove any connection between an individual plaintiff's decision to purchase and the alleged omission.

b.     Scienter under the MCFA

Polaris argues that the MCFA requires proof of scienter, noting that the defendant must have acted "with the intent that others rely thereon." Minn. Stat. § 325F.69 subd. 1. Plaintiffs maintain, without elaboration, that scienter is not required. (Pls' Tab C at 2 & n.2.) To the extent the parties read "scienter" to mean intentional misrepresentations, courts have held that the MCFA "does not require the making of an intentional misrepresentation." *Freeman v. A & J Auto MN, Inc.*, No. A03-153, 2003 WL 22136807, at *4 (Minn. Ct. App. Sept. 16, 2003); *see also Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1086 (D. Minn. 2001) (same).[8]

---

[8] In *Curtis Lumber Co. v. Louisiana Pacific Corp.*, the Eighth Circuit considered several state consumer protection laws, including Minnesota's, in concluding that Arkansas's consumer protection statutes do not require proof of intent to deceive. 618 F.3d 762, 778–79 (8th Cir. 2010). Like the MCFA, the terms of other state statutes "require[] only that a violator intend for a purchaser to *rely* on his acts or omissions." *Id*. at 778 (emphasis in original) (citing *Warren v. LeMay*, 491 N.E.2d 464, 474 (Ill. App. Ct. 1986)). Despite this statutory language, the court found that the consumer protection laws of other states, including Minnesota, do not require intent to deceive. *See id*. at 778 & n.12 (citing MCFA and *McNamara v. Nomeco Bldg. Specialties, Inc.*, 26 F. Supp. 2d 1168, 1171 (D. Minn. 1998) ("Simply stated, one making representations in the sale of consumer goods can be held liable, even though he had no specific intent to falsely mislead the consumer.")).

2. *California*

On behalf of Plaintiff Daniel Badilla, the Complaint alleges violations of two California statutes: the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5), (7). A plaintiff may base claims under the UCL and CLRA on an alleged omission, "[but] to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact that the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 126 (Cal. Ct. App. 2006) (UCL and CLRA); *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). The Court will review the elements of the UCL and CLRA, then address the issues of reliance and scienter under both statutes.

a.     The UCL

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Because the UCL is "written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003), *as amended* (Sept. 22, 2003) (quoting *Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel Co.*, 20 Cal. 4th 163, 180 (1999)). To prevail on a UCL claim, a plaintiff must prove that the defendant engaged in a business practice proscribed under one of these three varieties of unfair competition, and that the plaintiff was injured "as a result of" the business practice.

*In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *19

(S.D.N.Y. July 15, 2016). The Complaint alleges that Polaris engaged in all three varieties

of unfair competition, resulting in injury to California purchasers. (*See* SAC ¶ 107 (Badilla

and class members "suffered injury" as a "direct result" of Polaris's "unlawful, unfair, or

fraudulent business acts and/or practices").)[9]

The three varieties of unfair competition—also known as the prongs of the UCL—

have different thresholds. Under the "unlawful" prong, a "violation of another law is a

predicate for stating a cause of action." *Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218,

231 (Cal. Ct. App. 2014) (citation omitted); *see also Lazar v. Hertz Corp.*, 82 Cal. Rptr. 3d

368, 375 (Cal. Ct. App. 1999) (find that under its "unlawful" prong, "the UCL borrows

violations of other laws . . . and makes those unlawful practices actionable under the

UCL."). The Court presumes that the CLRA forms the basis of the "unlawful" prong of

Plaintiffs' UCL claim. *See Falco v. Nissan N. Am. Inc.*, No. CV1300686DDPMANX, 2016

WL 1327474, at *9 (C.D. Cal. Apr. 5, 2016) ("Plaintiffs can rely on an underlying CLRA

violation for their UCL claim.").

In determining whether a business practice is "unfair" under the UCL, California

appellate courts have been split regarding the proper test to employ. *See Linde, LLC v.*

---

[9] More specifically, the Complaint alleges Polaris engaged in "unlawful business acts and/or practices by not informing consumers that [its] Sportsman ATV could cause risks of product deformation and burns," (SAC ¶ 102), "unfair business acts and practices" by "seeking to profit from selling ATVs that possess a latent defect," and "fraudulent conduct" based on "fail[ing] to inform customers of exhaust heat defect." (*Id*. ¶¶ 104, 105).

*Valley Protein, LLC*, No. 116CV00527DADEPG, 2019 WL 3035551, at *21 (E.D. Cal. July 11, 2019) (summarizing split among appellate courts); *Zhang v. Superior Court*, 304 P.3d 163, 174 n.9 (Cal. 2013) (noting that the standard for determining what business acts or practices are "unfair" in consumer actions under the UCL is unsettled). Under one line of cases, an unfair business practice occurs "when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Graham*, 172 Cal. Rptr. 3d at 233 (citation and quotation marks omitted).

A second line of cases considers the factors for unfairness set forth in section 5 of the Federal Trade Commission Act: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Id*. (citation and quotation marks omitted). A third line of cases holds that "a plaintiff alleging an unfair business practice must show the defendant's conduct is tethered to an underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law." *Id*. at 233–234 (cleaned up). The Complaint alleges Polaris engaged in "unfair" business practices by "seeking to profit from selling ATVs that possess a latent

defect."[10] (SAC ¶ 104.) Because the Complaint alleges these practices are "immoral, unscrupulous, and offends public policy," Plaintiffs appear to be proceeding under the first standard for unfairness (and possibly the third).

Finally, a business practice is "fraudulent" under the UCL if "members of the public are 'likely to be deceived.'" *Graham*, 172 Cal. Rptr. 3d at 234 (quoting *Buller v. Sutter Health*, 74 Cal. Rptr. 3d 47, 51 (Cal. Ct. App. 2008)).

b.      The CLRA

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The CLRA defines "consumer" as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). The Complaint alleges that through fraudulent omissions about the Sportsman ATVs' exhaust heat defect, Polaris violated CLRA §§ 1770(a)(5) and 1770(a)(7), which prohibit representing that goods "have . . . characteristics . . . uses, benefits, or quantities that they do not have," *id*. § 1770(a)(5), and "are of a particular standard, quality, or grade," *id.* § 1770(a)(7). (SAC ¶¶ 115–16.) To prevail under a CLRA claim, a plaintiff must show that the defendant's conduct was deceptive and that the deception caused them

_____

[10] Plaintiffs have since abandoned their latent defect theory. Because the parties did not address the three prongs of the UCL in their briefing, it is not clear whether Plaintiffs have likewise abandoned their UCL unfairness claim.

harm. *Mass. Mut. Life Ins. Co. v. Superior Court*, 119 Cal. Rptr. 2d 190, 197 (Cal. Ct. App. 2002) (citing Cal. Civ. Code § 1780(a)).

    c.    Reliance under the UCL and CLRA

Reliance is a necessary element of a UCL claim. *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047–48 (N.D. Cal. 2014) (requiring "actual reliance" for claims under all three prongs of the UCL) (citing *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) (fraud prong); *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 687–88 (Cal. Ct. App. 2010) (unlawful prong); *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 888 (Cal. 2011)). The CLRA also requires proof of reliance. *See Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 3440600, at *3, *5 (N.D. Cal. June 20, 2016). To prove "reliance on an omission" under both the UCL and CLRA,

> a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision. A plaintiff may do so by simply proving "that, had the omitted information been disclosed, one would have been aware of it and behaved differently."

*Daniel*, 806 F.3d at 1225 (citation omitted) (quoting *Mirkin v. Wasserman*, 858 P.2d 568, 574 (Cal. 1993)). "That one would have behaved differently can be presumed, or at least inferred, when the omission is material . . . . An omission is material if a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Id*. (quoting *Tobacco II*, 207 P.3d at 39).

In the context of a class action, "California . . . requires *named* class plaintiffs to demonstrate reliance." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) (emphasis added) (considering UCL and CLRA claims). Under the CLRA, "named and unnamed plaintiffs must prove the alleged deceptive conduct caused that damage." *Mullins*, 2016 WL 3440600, at *3 (citing *In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 337–38 (Cal. Ct. App. 2010)). "Causation, and an inference of reliance, for the class in a CLRA claim can be shown as to an entire class by proving materiality." *Falco*, 2016 WL 1327474, at *7 (citation and quotation marks omitted); *see Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015) (finding that defendant's failure to disclose information that would have been material to a reasonable person purchasing defendant's product gave rise to a rebuttable inference of reliance as to the class). Courts applying these statutes have noted that in some cases, "it is fair to assume that all of the purchasers . . . read some marketing materials regarding the product, [so it is] sufficient to conclude that [d]efendants' conduct in omitting information was likely to deceive members of the public." *McVicar v. Goodman Glob., Inc.*, No. SACV131223DOCRNBX, 2015 WL 4945730, at *11 (C.D. Cal. Aug. 20, 2015) (cleaned up). But class certification of UCL and CLRA claims is inappropriate where the plaintiff "cannot show that members of the class were exposed to the same misrepresentations or any omissions, for example, . . . where the misrepresentations or nondisclosures were included (or would have been included) on the product itself." *Id.*; *see also Mazza*, 666 F.3d at 596 ("A presumption of reliance does

not arise when class members were exposed to quite disparate information from various representatives of the defendant.") (citation and quotation marks omitted).

Courts applying the CLRA and UCL have also found that the fact that "a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones." *Mass. Mut. Life Ins. Co.*, 119 Cal. Rptr. 2d at 197. Establishing lack of causation as to a handful of class members "does not necessarily render the issue of causation an individual, rather than a common, one." *In re Vioxx Class Cases*, 103 Cal. Rptr. 83, 95 (Cal. Ct. App. 2009). "Plaintiffs may satisfy their burden of showing causation as to each by showing materiality as to all . . . . [I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Id*. (cleaned up).

d.      Scienter under the UCL and CLRA

California courts applying the UCL and the CLRA have found that neither statute imposes a scienter requirement. *See, e.g., Mazza*, 666 F.3d at 591 (stating the UCL and CLRA "have no scienter requirement"); *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 717 (Cal. 2000) ("[A] plaintiff need not show that a UCL defendant intended to injure anyone through its unfair or unlawful conduct.").[11] But Plaintiffs must establish a

---

[11] At least one court has found that one of the unfair business practice claims under the CLRA has a scienter requirement. *Mullins*, 2016 WL 3440600, at *6 (citing Cal. Civ. Code

defendant's knowledge of an undisclosed defect at the time of sale under the UCL and CLRA. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145–46 (9th Cir. 2012); *id*. at 1145 n.5 (under the UCL, the "failure to disclose a . . . defect of which [a defendant] is not aware, does not constitute an unfair or fraudulent practice"); *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (under UCL and CLRA, "a party must allege . . . that the manufacturer knew of the defect at the time a sale was made.") (citation omitted).

### 3. *Florida*

The Complaint alleges that Polaris violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*, by omitting material information about the Sportsman ATVs, thus injuring Plaintiff James Kelley and other Florida purchasers. (SAC ¶¶ 130–32.) FDUTPA provides for a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008) (citation omitted); *see* Fla. Stat. § 501.211(2) ("In any actions brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages").

---

§ 1770(a)(9) (prohibiting "[a]dvertising goods or services with intent not to sell them as advertised.")).

To satisfy the first element of a FDUTPA claim, a plaintiff "must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016) (citation and quotation marks omitted); *see Millenium Commc'ns & Fulfillment Inc. v. Office of the Attorney Gen*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000) (quoting *Sw. Sunsites, Inc. v. Fed. Trade. Comm'n*, 785 F.2d 1431, 1434–35) ("[D]eception [occurs] if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."). This element "is only satisfied by evaluating a reasonable consumer in the same circumstances as plaintiff." *Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *6 (S.D. Fla. Sept. 30, 2018) (citation omitted). "The modification of 'acting reasonably' by 'in the same circumstances' indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context." *Id.* (quoting *Deere Constr. v. Cemex Constr. Materials Fla., LLC*, No. 15-24375-CIV, 2016 WL 8542540, *3 (S.D. Fla. Dec. 1, 2016)); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 390 (S.D.N.Y. 2016)) (describing FDUTPA's "hybrid standard" as being "objectively established as to mindset but subjectively established as to context.").

a.     <u>Reliance under the FDUTPA</u>

A FDUTPA plaintiff "need not show actual reliance on the representation or omission at issue." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000); *see*

*also Maor*, 2018 WL 4698512, at *6 (noting "proof of actual reliance is unnecessary" under the FDUPTA). A "demonstration of reliance by an individual consumer is not necessary in the context of FDUTPA." *Turner Greenberg Assocs., Inc. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. Dist. Ct. App. 2004); *see, e.g., Davis*, 776 So. 2d at 974 (holding class members proceeding under FDUTPA "need not prove individual reliance on the alleged representation"). Rather, "a plaintiff must simply prove that an objectively reasonable person [in the same circumstances as the plaintiff] would have been deceived." *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015) (quoting *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011)).

b.      Scienter under the FDUTPA

While neither the parties nor the Court were able to locate case law addressing FDUTPA and scienter *per se*, courts have found that a plaintiff does not need to prove "the seller's intent to deceive" under FDUTPA. *See, e.g., In re Schurtenberger*, No. 12-17246-BKC-AJC, 2014 WL 92828, at *5 (Bankr. S.D. Fla. Jan. 9, 2014) (citing *Davis*, 776 So. 2d at 974). Some courts have held that FDUTPA does not require a defendant "to have subjective knowledge of the alleged defects." *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011); *see also Motorola Mobility, Inc. v. CT Miami, LLC*, No. 11-23753-CV, 2012 WL 13014338, at *3 (S.D. Fla. May 11, 2012), *report and recommendation adopted*, No. 11-23753-CIV, 2012 WL 13014339 (S.D. Fla. June 13, 2012) ("FDUTPA focuses

on whether an act is deceptive, not whether a defendant knew that the allegedly violative conduct was occurring.").

4.    *Missouri*

The Complaint alleges that Polaris failed to inform consumers of the Sportsman ATVs' exhaust heat defect, thereby violating Missouri's Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010, *et seq.*, and injuring Plaintiff Kevin Wonders and other Missouri purchasers. (SAC Count VI.) The Complaint alleges that Wonders brings this claim individually and on behalf of consumers who purchased a Sportsman ATV "primarily for personal, family or household purposes."[12] (SAC ¶ 145.) The MMPA prohibits any person from engaging in "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri." Mo. Rev. Stat. § 407.020. To prevail on an MMPA claim, a plaintiff must prove he or she: (1) purchased merchandise from the defendant; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the MMPA. *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. Ct. App. 2016); *see* Mo. Rev. Stat. § 407.025. "[T]he plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising

_____

[12] Plaintiffs do not so limit any of their other state consumer protection claims.

practice." *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008) (citing Mo. Rev. Stat. § 407.025.1). Under the MMPA, a "material fact" is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773 (Mo. 2007) (citing 15 C.S.R. 60–9.010(1)(C)).

### a. Reliance under the MMPA

The parties agree that a consumer's reliance on an unlawful practice is not required under the MMPA. *Hess*, 220 S.W.3d at 774; *Plubell v. Merck & Co.*, 289 S.W.3d 707, 713 (Mo. Ct. App. 2009) (The MMPA "eliminat[ed] the need to prove an intent to defraud or reliance.").

### b. Scienter under the MMPA

A claim for "omission of a material fact under the MMPA does have a scienter requirement: it is a failure to disclose material facts that are 'known to him/her, or upon reasonable inquiry would be known to him/her.'" *Plubell*, 289 S.W.3d at 714 n.4 (quoting 15 C.S.R. 60–9.110); Under the MMPA, the plaintiff must show (1) the defendant "was aware of the alleged defect," (2) "when [defendant] became aware," and (3) "that [defendant] purposefully omitted this fact in representations to each individual class member." *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 84 (Mo. Ct. App. 2011).

*5.      New York*

The Complaint alleges that Polaris violated New York's General Business Law ("GBL"), N.Y. Gen. Bus. § 349, by failing to disclose the Sportsman ATVs' exhaust heat defect, thereby injuring Plaintiff William Bates and other New York purchasers. (SAC Count VII.) GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." GBL § 349(a). To prove a claim under GBL § 349(a), a plaintiff must show that (1) "the challenged act or practice was consumer-oriented,"(2) "it was misleading in a material way," and (3) "the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Whether a representation or an omission, the deceptive practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)). To satisfy the GBL's causation requirement, "nothing more is required than that a plaintiff suffer a loss because of defendant's deceptive act." *Goldemberg*, 317 F.R.D. at 392 (cleaned up) (citing, among others, *Stutman*, 95 N.Y.2d at 30). A plaintiff seeking compensatory damages must show that the material deceptive practice caused "actual, although not necessarily pecuniary, harm." *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 562 (S.D.N.Y. 2016) (citing *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745).

<u>a.</u>     <u>Reliance under the GBL</u>

The parties agree that individual reliance is not required under GBL § 349. *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745; *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012) ("Justifiable reliance by the plaintiff is not an element" of GBL § 349); *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999) ("Intent to defraud and justifiable reliance by the plaintiff are not elements of the statutory claim.").

<u>b.</u>     <u>Scienter under the GBL</u>

The parties also agree that scienter is not required under GBL § 349. *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745 ("Although it is not necessary under the statute that a plaintiff establish the defendant's intent to defraud or mislead, proof of scienter permits the court to treble the damages up to $1,000.").

*6.     North Carolina*

The Complaint alleges that Polaris violated North Carolina's Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1(a), by not disclosing the defect in the Sportsman ATVs to customers, thereby injuring Plaintiff James Pinion and other North Carolina purchasers. (SAC ¶¶ 171–74.) Section 75-1.1 provides in part that "unfair or deceptive acts or practices in or affecting commerce" are unlawful. N.C. Gen. Stat. § 75-1.1(a). "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused

injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013) (brackets omitted) (quoting *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). "The determination of whether an act or practice is an unfair or deceptive practice that violates [NCUDTPA] is a question of law for the court." *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).

Courts applying the NCUDTPA have held that "[in] order for silence or an omission by the defendants to be an actionable fraud, it must relate to a material matter known by the defendants which they had a legal duty to communicate to plaintiff." *Resnick v. Hyundai Motor Am., Inc.*, No. CV1600593BROPJWX, 2017 WL 6549931, at *18 (C.D. Cal. Aug. 21, 2017) (emphasis omitted) (citing *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997) (finding plaintiff failed to state NCUDTPA claim based on defendants' lack of knowledge)).

### a.    Reliance under the NCUDTPA

North Carolina courts have held that a plaintiff must prove actual and justifiable reliance for a NCUDPTA claim based on a misrepresentation. *See, e.g., Bumpers,* 747 S.E.2d at 226. Courts have applied this rule to omissions as well. *See, e.g., Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 781 S.E.2d 1, 7 (N.C. 2015) (affirming dismissal of NC § 75-1.1 claim because "plaintiffs have failed to sufficiently allege justifiable reliance on any omission" and that any action "was the proximate cause of their harm"); *W. Franklin Pres. Ltd. P'ship v. Nurtur N.C., LLC*, No. 14-CV-00266, 2016 WL 3039832, at *4 (M.D.N.C. May

27, 2016) (explaining that a NCUDTPA claim would fail for lack of proximate cause if the jury concluded that either (1) the consumer "did not rely on" the concealment of material fact or a material false statement, or (2) "that its reliance was unreasonable"). This Court agrees that "reliance on an omission is required to state [a NC] UDTPA claim." *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 970 (N.D. Cal. 2018) (citing *Sain v. Adams Auto Grp., Inc.*, 781 S.E.2d 655, 659 (N.C. Ct. App. 2016)).

Plaintiffs note that even if reliance is required under the NCUDTPA, reliance can be proved by circumstantial evidence that consumers found a misrepresentation material and relied upon it. (ECF No. 335 ("Pls' Class Cert. Br.") at 27 n.109 (citing *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 517–18 (6th Cir. 2015) (affirming class certification of NCDUTPA claim where "classwide proof—that the alleged misrepresentation is material and was made in a generally uniform manner to all class members—would also suffice in North Carolina to show actual reliance"))); *see, e.g., In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018) (finding "sufficient evidence of the uniformity and materiality of the putative misrepresentations and omissions has been presented to presume class-wide reliance" under NCUDTPA).

b.    Scienter under the NCUDTPA

The parties agree that scienter is not required under the NCDUTPA. *See Marshall v. Miller*, 276 S.E.2d 397 (N.C. 1981) ("If unfairness and deception are gauged by consideration of the effect of the practice on the marketplace, it follows that the intent of

the actor is irrelevant."). While "it is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Chastain v. Wall*, 337 S.E.2d 150, 153 (N.C. Ct. App. 1985) (citation omitted).

7.  *Outcome-determinative conflicts exist*

Based on the assessment of consumer protection statutes above, the Court agrees that consumer protection laws "vary considerably," and that "different states have material variances between their consumer protection laws and Minnesota's." *St. Jude I*, 425 F.3d at 1120. For example, outcome-determinative conflicts exist between the MCFA and the three prongs of California's UCL, which have different thresholds from the MCFA. The MCFA does not require proof of individual reliance, but it does require a causal nexus between the violative conduct and damages, such that a defendant's conduct had some impact on inducing the individual plaintiff's actions. In contrast, the UCL and CLRA require reliance on an omission, which may be proved by showing that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel*, 806 F.3d at 1225.

Courts applying the MCFA and the California statutes also differ in their consideration of proof of non-reliance in class actions. Courts applying the MCFA have concluded that where a defendant can present evidence concerning the non-reliance of

individual plaintiffs, the resolution of the defendant's potential liability to each plaintiff will be dominated by individual issues of causation and reliance. *See, e.g., St. Jude II*, 522 F.3d at 839–40. In contrast, courts applying the UCL and CLRA have held that such evidence would not preclude class certification. *Mass. Mut. Life Ins.*, 119 Cal. Rptr. 2d at 197. This difference is outcome-determinative here because Polaris has offered evidence raising individual issues of causation and reliance. (*See, e.g.*, ECF No. 336-39 ("Pinion Dep.") at 85:17–19 (Pinion purchased a second Sportsman ATV for his wife after his first melted); ECF No. 359-2 ("Johannessohn Dep.") at 207:19–22, 209:1–9 (Johannessohn requested and received a new Sportsman ATV after filing this lawsuit)).

Another conflict exists as to the scope of the laws. Unlike the MCFA, the CLRA and Missouri's MMPA are limited to goods or services purchased for "personal, family, or household purposes." *See* Cal Civ. Code § 1761(d), *Murphy*, 503 S.W.3d at 311. Polaris offers evidence that a portion of Sportsman ATV purchasers use them for farming, ranching, and other business purposes. (*See e.g.*, ECF No. 367 (Pixton Decl.) Ex. 8, ("Flambures Decl.") ¶ 11 (dealership general manager stating that approximately 30 percent of his buyers purchase for commercial use).) Ignoring this element would allow some claims under the MCFA which would fail under the CLRA and MMPA.

As to the remaining states, outcome-determinative differences emerge as well. The MCFA and Florida's FDUPTA have outcome-determinative differences because of FDUPTA's "hybrid standard" for determining deceptive acts or unfair practices. *See*

*Maor*, 2018 WL 4698512, at *6 (explaining the hybrid standard "may be objectively established as to mindset but subjectively established as to context" (citation omitted)). The MCFA and New York's GBL have outcome-determinative differences because unlike the MCFA's causal nexus standard, the GBL requires nothing more than that a plaintiff suffer a loss because of defendants' deceptive conduct. Finally, an outcome-determinative difference exists between the MCFA and North Carolina's NCDUPTA because the NCDUPTA requires actual and justifiable reliance.

Plaintiffs argue that the consumer protection statutes of Minnesota, California, Florida, Missouri, and New York (1) do not conflict because none of them require proof of individual reliance, and (2) permit consumers to prove injury and measure of damages by showing consumers paid a price premium artificially inflated by the seller's deceptive conduct. (ECF No. 391 ("Pls' Class Cert. Reply Br.") at 25–26.) On this point, the cases cited by Plaintiffs are unhelpful in determining the choice of law issue, as they do not consider whether conflicts exist among state laws.[13]

---

[13] *See, e.g., Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 290–91 (N.D. Cal. 2017) (not addressing conflicts of law; granting certification of multiple classes based on various consumer protection statutes, including a California class based on the UCL and CLRA, a class for violations of FDUTPA, and a class for violations of MCFA); *In re Kind LLC "Healthy & All Natural" Litig.*, 209 F. Supp. 3d 689, 697 & n.4 (S.D.N.Y. 2016) (providing little analysis of states' statutes, and not determining which, if any, state's consumer protection law would apply to a nationwide class.); *Goldemberg*, 317 F.R.D. at 386 (not addressing conflicts of law where plaintiffs moved to certify three classes based on products purchased in California, Florida, and New York); *Khoday v. Symantec Corp.*, No. CIV. 11-180 JRT/TNL, 2014 WL 1281600, *20 n.9 (D. Minn. Mar. 13, 2014) (explaining that

### B. *Constitutionality of Extraterritorial Application*

Having determined that outcome-determinative conflicts exist between the state consumer protection statutes, the Court considers the constitutionality of applying the MCFA extraterritorially. The inquiry is into the contacts with Minnesota arising out of the nonresident-parties' claims. *St. Jude I*, 425 F.3d at 1120. And the analysis begins with a presumption: "In general, there is a presumption against the extra-territorial application of a state's statutes." *Arnold v. Cargill, Inc.*, No. CIV. 012086 (DWF/AJB), 2002 WL 1576141, at *2 (D. Minn. July 15, 2002) (citing *In re Pratt*, 219 Minn. 414, 18 N.W.2d 147, 153 (Minn. 1945)). Polaris argues that the MCFA cannot be applied extraterritorially because the Minnesota legislature did not specify that it is intended to apply outside Minnesota. *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1232–33 (D. Kan. 2015) (concluding MCFA "may be applied in this case only to conduct taking place in Minnesota" where plaintiffs did not point to any statutory language allowing for its extraterritorial application).

Plaintiffs do not provide any statutory language indicating that the MCFA applies extraterritorially. Rather, they argue simply that it has been done before; that is, that courts have applied the MCFA to the claims of parties from other forum states. *See, e.g., In re St. Jude*, 2006 WL 2943154, *rev'd on other grounds, St. Jude II*, 522 F.3d 836; *Mooney v.*

---

the court did not undertake a choice of law analysis because it found that choice-of-law clauses governed the defendants' contracts with the plaintiffs).

*Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531, 534–35 (D. Minn. 2007). None of the cases cited by Plaintiffs holds that the Minnesota legislature intended the MCFA to apply extraterritorially. Given the presumption against the extraterritorial application of Minnesota statutes and the lack of any statutory language allowing such an application, the Court concludes that the MCFA may be applied only to conduct that occurred in Minnesota. *See Syngenta*, 131 F. Supp. 3d at 1233.

Even if the Minnesota legislature generally intended the MCFA to apply extraterritorially, it does not follow that doing so would be constitutionally permissible in this particular case. *See, e.g., Arnold*, 2002 WL 1576141, at *4 (noting that even if the court found the MHRA provided for extraterritorial application, "the Court does not find, under a due process analysis, sufficient contacts with the state of Minnesota" with respect to nonresident plaintiffs). "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985); *Jepson*, 513 N.W.2d at 469; *see also Shutts*, 472 U.S. at 821–22 (holding a state must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class to apply that state's law). When considering fairness in this context, "an important element is the expectation of the parties." *Shutts*, 472 U.S. at 822.

Plaintiffs argue that Minnesota has significant contacts with Polaris and with the facts giving rise to their claims because: (1) Polaris designed, manufactured, and tested the defective vehicles at issue in Minnesota; (2) Polaris received consumer complaints and warranty claims in Minnesota; and (3) Polaris is headquartered in Minnesota. *See Mooney*, 244 F.R.D. at 535 ("As a Minnesota corporation, Allianz can not claim surprise by the application of Minnesota law to conduct emanating from Minnesota.").

The location of a defendant's headquarters, by itself, is not enough to apply the law of that state. In *St. Jude I*, the Eighth Circuit reversed the district court's decision to apply Minnesota law to claims of nonresident plaintiffs. There, even though the defendant had significant contacts with Minnesota, including being headquartered there, and even though much of the conduct relevant to the claims occurred or emanated from Minnesota, the Eighth Circuit remanded because the district court failed to conduct a thorough conflicts-of-law analysis with respect to each plaintiff. 425 F.3d at 1119–21. So even combined with the fact that Polaris's headquarters are in Minnesota, the fact that some relevant conduct occurred or emanated from Minnesota may not be sufficient to apply Minnesota law. *See id.; accord Arnold*, 2002 WL 1576141, at *4 (holding that the fact that defendant's headquarters were located in and its contested policies emanated from Minnesota was "insufficient to justify extraterritorial application, particularly when there is no evidence . . . [defendant] could not otherwise be held accountable in the courts of other states where the named plaintiffs reside and/or work.").

That Polaris designed, manufactured, tested, and received complaints about Sportsman ATVs in Minnesota certainly supports Polaris's expectation that the MFCA would apply. But this evidence does not support the assertion that nonresident Plaintiffs expected Minnesota law to apply. Plaintiffs claim that consumers expected Minnesota law to apply based on Polaris's Minnesota address and phone number in the owner's manual. The Court finds this argument unpersuasive, particularly given that the sales contracts of some Plaintiffs reference the laws of the states in which they purchased their ATVs. (*See, e.g.*, ECF No. 359-7 (Bates's contract referencing "the law of the State of New York"); ECF No. 359-9 (Kelley's contract referencing Florida law); ECF No. 359-12 (Pinion's contract "[North Carolina] law does not provide for a 'cooling off' or other cancellation period for this sale"); ECF No. 359-5 (Badilla's contract with similar disclosure under California law)). Indeed, Plaintiff Badilla admitted that he did not know the location of Polaris's headquarters when he bought his ATV. *See St. Jude I*, 425 F.3d at 1120 (reversing choice of law decision where there was "no indication out-of-state parties 'had any idea that Minnesota law could control' potential claims when they received their" products). Plaintiffs purchased their ATVs from dealers in their state of residence, not from Polaris in Minnesota. *See Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 517 (D. Minn. 2014) (distinguishing *Mooney* because there, plaintiffs "purchased a financial product directly from the defendant" located in Minnesota).

Given the dearth of evidence that the parties expected Minnesota law would apply to the nonresident Plaintiffs' claims against Polaris, Minnesota does not have contacts sufficient to create a state interest, and it would be arbitrary and fundamentally unfair to apply the MCFA to such claims. The Court therefore concludes that extraterritorial application of the MCFA is not constitutionally permissible in this case.

### C.    *Five-Factor Test*

Even if applying the MCFA extraterritorially were constitutionally permissible, the choice-of-law factors buttress the Court's determination not to apply the MCFA to the nonresident Plaintiffs' claims. Those choice-influencing factors are: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Jepson*, 513 N.W.2d at 470. These factors were intended to "prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law." *Id*.

#### 1.    *Predictability of Result*

The predictability-of result-factor "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000). It addresses whether the choice of law was predictable before the time of the transaction or event giving rise to the claim. *Rapp*, 302 F.R.D. at 517. This factor applies

primarily to consensual transactions where parties "desire advance notice of which state law will govern in future disputes." *Nodak Mut. Ins. Co.*, 604 N.W.2d at 94. In most tort cases, predictability of result is of little relevance. *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738 (8th Cir. 1995). Consumer protection claims are not based entirely in either tort or contract law. *In re St. Jude*, 2006 WL 2943154, at *5.

Plaintiffs argue that this factor favors them because Polaris is headquartered in Minnesota, where it designed, engineered, manufactured and tested the ATVs, received consumer complaints, and allegedly decided to conceal the heat exhaust defect from consumers. But as noted above, Plaintiffs purchased their ATVs from dealers in their states of residence (not directly from Polaris), and most of the sales contracts with Plaintiffs provide that the laws of their states of residence apply. These facts indicate that, before the time of the transaction, the parties would predict that the law of the state of each plaintiff's residence would apply.

2.      *Maintenance of Interstate Order*

The maintenance-of-interstate-order factor is concerned with whether applying Minnesota law would manifest disrespect for other state sovereignty or impede the interstate movement of people and goods. *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003). "An aspect of this concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." *Nodak Mut. Ins. Co.*, 604 N.W.2d at 95.

By considering whether application of Minnesota law would negatively affect the maintenance of interstate order, "the opportunities for forum shopping may be kept within reasonable bounds." *Jepson*, 513 N.W.2d at 471.

In *Hughes v. Wal-Mart Stores, Inc.*, the Eighth Circuit explained that where a state "has little or no contact with a case and nearly all of the significant contacts are with a sister state," the factor suggests that a state should not apply its own law to the dispute. 250 F.3d 618, 620–21 (8th Cir. 2001) (citation and quotation marks omitted). In that case, a Louisiana resident had purchased the product at issue at a Wal-Mart in Louisiana, the injury occurred in Louisiana, and the injured party was a Louisiana resident. *Id*. at 621. The only contact Arkansas had to the litigation was that the defendant had its principal place of business in the state. *Id*. The court found that this contact was insufficient to apply Arkansas law. *Id*.; *cf. Sportsman for Sportsman v. Cal. Overland, Ltd.*, No. CV 17-1064 (DWF/KMM), 2018 WL 1865930, at *5 (D. Minn. Apr. 18, 2018) (concluding that defendant's "substantial business operations in Minnesota are the more relevant contacts" where "relevant conduct by [defendant] that most likely occurred within this state is central to Plaintiff's case").

Plaintiffs maintain that Minnesota has a stronger interest in a case that involves a remedial statute like the MCFA than one involving common law claims. In support, they cite *Land O' Lakes, Inc. v. Employers Mutual Liability Insurance Company of Wisconsin*. 846 F. Supp. 2d 1007, 1040 (D. Minn. 2012). That case involved insurance claim issues, finding

that Minnesota had a strong interest in applying its law to contribution claims against insurers who write policies in Minnesota. *Id*. at 1040. The court applied the law of where the insured was located, *i.e.*, Minnesota, to the contribution claims, rather than the state law that generally governed the insurer's policies. *Id*. No party had argued for the law of the insurer's headquarters.

Here, Plaintiffs' claims are based on Polaris's failure to disclose the alleged heat exhaust defect in the Sportsman ATVs. The parties agree that Plaintiffs' alleged injuries occurred where each plaintiff resides or purchased a Sportsman ATV. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("If recovery for . . . consumer fraud is possible, the injury is decidedly where the consumer is located, rather than where the seller maintains its headquarters."); *cf.* Restatement (Second) of Conflict of Laws § 145, subd. 2, cmts. (e), (f) (1971) (noting the location of the injury is "less significant" in the case of fraudulent misrepresentations). As revealed in the Court's analysis above, states have adopted different regulatory regimes to protect consumers within their borders. Applying the MCFA to the claims of nonresident plaintiffs would demonstrate disrespect for these regulatory regimes. *St. Jude I*, 425 F.3d at 1120 ("[S]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."). Given Minnesota's limited contact with these claims, particularly as compared with the significant contacts

with Plaintiffs' states of residence, the Court finds that applying the MCFA to the nonresident Plaintiffs' claims would subvert the interests of those states.

### 3.     *Simplification of the Judicial Task*

In considering the simplification of the judicial task, "the relevant question is not whether applying the law of one state would be simpler than applying the laws of 50 states. Instead, the question is whether, with respect to any particular claimant, applying the law of Minnesota would be simpler than applying the law that would otherwise apply." *Rapp*, 302 F.R.D. at 518 (citing *St. Jude I*, 425 F.3d at 1120). The parties did not address this factor in any detail, likely because Minnesota courts do not give this factor much weight. *See, e.g., Nodak Mut. Ins. Co.*, 604 N.W.2d at 95. With respect to any particular plaintiff, the Court is capable of applying the MCFA or the state law of that plaintiff's residence. Thus, this factor is neutral.

### 4.     *Advancement of the Forum's Governmental Interest*

In considering the advancement of the forum's governmental interest, the Court must weigh the policy interests of Minnesota with those of a nonresident plaintiff's home state. *Nesladek*, 46 F.3d at 739–40. This factor "generally weighs in favor of application of the state law in which the plaintiff lives and in which the injury occurred." *In re Baycol Prod. Litig.*, 218 F.R.D. at 207 (collecting cases). Plaintiffs claim that Minnesota has a compelling interest in redressing wrongs committed within its borders because the reputations of other Minnesota businesses are tarnished. While they cite *Boatwright v.*

*Budak* for this proposition, the case does not support it. 625 N.W.2d 483, 489 (Minn. Ct. App. 2001). *Boatwright* addressed choice of law in the context of vicarious liability for a car accident that occurred in Iowa and found that Iowa law should apply because it "best serves Minnesota's interest in compensating tort victims." *Id*. The Eighth Circuit has held that "[a]bsent some relevant connection between a state and the facts underlying the litigation," it "fail[ed] to see how any important [state] governmental interest is significantly furthered by ensuring that nonresidents are compensated for injuries that occur in another state." *Hughes*, 250 F.3d at 621.

Plaintiffs also rely on *Mooney*, which found that this factor favored application of the MCFA to a nonresident's claim because "[b]y allowing 'any person' to sue under the [MCFA], the Minnesota legislature has evinced a strong policy of providing redress for fraudulent business practices that occur within Minnesota's borders, regardless of where a consumer's injury occurs." 244 F.R.D. at 537. But there is no reason to believe that consumer protection laws of the nonresident Plaintiffs' states could not equally or more effectively hold Polaris accountable for its alleged wrongdoing. *See Rapp*, 302 F.R.D. at 518 (rejecting *Mooney*). This factor therefore favors applying the laws of the nonresident Plaintiffs' states.

5.      *Application of the Better Rule of Law*

The better-rule-of-law factor is not considered unless the other factors do not resolve the choice-of-law issue. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438,

455–56 (Minn. Ct. App. 2001); *Nodak Mut. Ins. Co.*, 604 N.W.2d at 96 (noting that the court "has not placed any emphasis on this factor in nearly 20 years"). Courts have refrained from resolving a conflict of law question based on the better-rule-of-law factor, recognizing that "states often have competing policy considerations for governing similar transactions or events in different manners such that the laws do not necessarily lend themselves to being labeled either 'better' or 'worse.'" *Hughes*, 250 F.3d at 621. The Court will refrain from determining which state has the "better" rule of law, as the states at issue have competing policy considerations for crafting their consumer protection laws.

Because most of the five factors do not favor applying the MCFA to the claims of the nonresident plaintiffs, the Court declines to do so. The law of each Plaintiff's state will apply to him.

## II.     Summary Judgment

With the choice of law question settled, the Court turns to the summary judgment motion, beginning with the familiar standard under Rule 56. "Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)). In assessing whether such a dispute exists, "[a] court must 'make all reasonable inferences in favor of the non-moving party,' but will 'not resort to speculation.'" *Hill v. Sw. Energy Co.*, 858 F.3d 481, 487 (8th Cir. 2017) (quoting

*Solomon v. Petray*, 795 F.3d 777, 788 (8th Cir. 2015)). "The burden of demonstrating an absence of a genuine dispute of material fact is on the moving party." *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Polaris contends that summary judgment is proper and that it is entitled to judgment as a matter of law because there is no evidence that any of the named Plaintiffs were injured and because four of the named Plaintiffs cannot establish required elements of their consumer protection claims. (ECF No. 358 ("Polaris Summ. J. Br.") at 18–29.) For the reasons discussed below, Polaris's arguments are unsuccessful.

### A.    *Price Premium Theory*

Polaris argues that each of the named Plaintiffs "must prove . . . the fact and extent of their claimed injury" to survive summary judgment. (Polaris Summ. J. Br. at 18.) The fact of injury must not be "speculative, remote, or conjectural," but proved "with certainty." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 928–29 (8th Cir. 2005). The "injury" claimed by Plaintiffs appears to be twofold. First, Plaintiffs argue that they did not receive the benefit of their bargain because the Sportsman ATVs present a risk of injury from overheating. Second, Plaintiffs argue that they overpaid for their Sportsman ATVs because the market would have valued the ATVs for less if consumers had known

that the ATVs presented this risk. Polaris focuses on this second prong of the injury in its summary judgment motion, arguing that the "overcharge" or "price premium" theory presented by Plaintiffs cannot survive summary judgment.

Polaris's argument against the price premium theory is that (1) Plaintiffs cannot use their own testimony, because an individual is not competent to testify about what the ATV price would have been but for the non-disclosure; (2) Plaintiffs cannot use their expert testimony, because the experts have no opinion as to any individual Plaintiff; and (3) Plaintiffs cannot use their expert testimony for the additional reason that the experts testify only to aggregate damages for the market.

The first problem with Polaris's arguments is that Polaris does not tie them to the state laws governing Plaintiffs' claims. (*Compare* Polaris Summ. J. Br. at 18–25 (arguing simply "no evidence establishes that any plaintiff was injured" without reference to the state laws at issue) *with id.* at 26–29 (arguing Johannessohn, Pinion, Kelley, and Bates cannot survive summary judgment under the MCFA, NCUDPTA, FDUTPA, and GBL, respectively).) Whether a failure to "prove . . . the fact and extent of [a] claimed injury" entitles Polaris to judgment as a matter of law depends on the requirements of the state laws that apply to Plaintiffs' claims.[14] As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, "the substantive law will identify which facts are material" because

---

[14] Polaris appears to recognize as much when distinguishing Plaintiffs' cited authorities. *See* Polaris Summ. J. Reply at 16 (arguing Plaintiffs cannot rely on *Carriuolo*, 823 F.3d 977 in support of their Minnesota law arguments because it applies Florida law).

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. 242, 248 (1986). The Court must then analyze the theory under each state's law.

1.    *The price premium theory is a legally cognizable injury under each state's law.*

Each state statute at issue recognizes, as a general proposition, that a consumer who pays a premium for a product based on a defendant's actionable misrepresentations or omissions has suffered a legally cognizable injury. That is, the MMPA, UCL, CLRA, FDUTPA, GBL, NCUDTPA, and MCFA each recognize that a consumer who overpays for an item because the actual value of the item he purchased was less than the value of the item as represented can establish that he has been injured. *See, e.g., Marty v. Anheuser-Busch Companies, LLC,* 43 F. Supp. 3d 1333, 1347 (S.D. Fla. 2014) (denying motion to dismiss UCL, CLRA, FDUTPA, and GBL claims, among others, because plaintiffs claimed that they had paid a premium price for beer based on the mistaken belief that it was imported from Germany). Courts applying the MMPA have reasoned that "under the benefit of the bargain rule as applied to MMPA claims, [p]laintiff[s] need only allege that the actual value of the product as purchased was less than the value of the product as represented to state a claim for an ascertainable loss." *Kelly v. Cape Cod Potato Chip Co.,* 81 F. Supp. 3d 754, 758–59 (W.D. Mo. 2015). Similarly, courts applying California's UCL and CLRA have determined that paying a price premium attributable to a defendant's actionable conduct is a cognizable injury under both of those statutes. *See, e.g., In re Gen.*

*Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *21–*22 (denying motion to dismiss UCL and CLRA claims because plaintiffs alleged "they purchased products that they otherwise would not have, or paid more than they otherwise would have paid, due to New GM's failure to disclose the ignition defects in their cars").

Courts have also determined that a plaintiff can establish a legally cognizable injury under the GBL by showing that she "overpaid for the product, or, stated differently, [that she] paid a premium for a product based on the defendants' inaccurate representations." *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 68 (E.D.N.Y. 2017) (cleaned up).[15] Similarly, a consumer who has paid a premium attributable to a defendant's actionable omissions or misrepresentations has suffered a cognizable injury under the FDUTPA. *See, e.g., Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 341 (D.N.J. 2014) (denying motion to dismiss where complaint alleged that "plaintiffs paid a price premium for an Energy Star certified washer, and paid higher energy bills because the machine did not in fact comply with efficiency standards").

Although this Court has found few cases addressing the price premium theory of damages under the NCUDTPA, it finds the reasoning of *Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2018 WL 6617106 (S.D. Ill. July 3, 2018) instructive. In *Suchanek*,

---

[15] *See also Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (collecting cases); *Ebin v. Kangadis Food Inc.*, No. 13 CIV. 2311 JSR, 2014 WL 737878, at *2 (S.D.N.Y. Feb. 25, 2014) (denying summary judgment where plaintiffs had adduced evidence that they had overpaid because they paid the price of olive oil for pomace).

plaintiffs brought claims under various state consumer fraud statutes, including the NCUDTPA, asserting that they and their class members were misled into paying the price of ground coffee for a product that was predominantly instant coffee. *Id.* at *2. The *Suchanek* court directed the parties to submit filings addressing, among other things, the elements of each statute that could be established using common proof. *Id.* The court first noted that under North Carolina law, "[a]ctual injury may include the loss of the use of specific and unique property, the loss of any appreciated value of the property, and such other elements of damages as may be shown by the evidence." *Id.* at *15 (quoting *Coley v. Champion Home Builders Co.*, 590 S.E.2d 20, 22 (N.C. Ct. App. 2004)). The court then determined that the price premium model set forth by the plaintiffs could suffice to show injury under the NCUDTPA. *See id.* at *15–16. Based on the reasoning of *Suchanek*, the Court concludes that paying a premium attributable to a defendant's actionable omissions or misrepresentations is a cognizable injury under the NCUDTPA.

This Court has also found few cases addressing the price premium theory of damages under the MCFA in similar circumstances. But based on its review of the relevant authority, it appears that paying a premium attributable to a defendant's actionable omissions or misrepresentations is a cognizable injury under the MCFA. *See, e.g.*, *Laughlin v. Target Corp.*, No. 12-CV-489 (JNE/JSM), 2012 WL 3065551, at *5 (D. Minn. July 27, 2012) (denying motion to dismiss where plaintiff claimed "she would not have purchased . . . footwear had she known that the shoes did not provide the advertised

benefits, that she paid an increased price for the shoes, and that she therefore suffered injury").

In addition to the fact of injury, proof of the extent of injury depends on the substantive laws at issue. Under the applicable state statutes, once the fact of injury is established, the extent of the injury need not be proved with precision, particularly at the summary judgment stage. *See, e.g.*, *Ebin*, 2014 WL 737878, at *2 ("New York . . . law squarely place[s] the burden of ascertaining the amount of damages, when the existence of damage is known but its extent is opaque, upon the alleged wrongdoer."); *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 231–32 (S.D.N.Y. 2019) ("Although [p]laintiffs may not need to prove the amount of damages to an absolute certainty to survive summary judgment, they do — under the law[s] of [California, Missouri, and Texas] — need some evidence of the fact of damages . . . to create a triable issue on that element of their claim."(emphasis omitted)). Polaris's cited authority is not to the contrary. *See* Polaris Summ. J. Br. at 18 (citing *Storage Tech. Corp.*, 395 F.3d at 928–29 ("Under Minnesota law, damages may not be speculative, remote, or conjectural. However, once the fact of damages is proved with certainty, the extent of damages need only be shown to have a reasonable basis in the evidence." (citation omitted))).

2.    *Daubert motion.*

Having concluded that the price premium theory can establish an injury under the relevant state consumer protection laws, the Court turns to whether the record contains

evidence that would allow a reasonable factfinder to find such injury. Plaintiffs offer the expert testimony of Richard Eichmann and Sara Butler, who have assessed an 8.8 percent price premium attributable to Polaris's failure to disclose the exhaust heat defect. (ECF No. 385 ("Pls' Summ. J. Opp.") at 25–29 ("Plaintiffs' experts Sara Butler and Richard Eichmann can provide the injury evidence called for under the applicable state law.").)

Polaris contends that the opinions and related work of Butler and Eichmann are inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. "When considering expert testimony, a district court must ensure that all scientific testimony is both reliable and relevant." *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) (citation and quotation marks omitted). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Id.* (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006)). District courts act as gatekeepers, making "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. The Eighth Circuit has cautioned that the "rejection of expert testimony is the exception rather than the rule." *In re Wholesale Grocery Prod.*

*Antitrust Litig.*, 946 F.3d at 1001; *see also Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (collecting cases).

a.     Methodology

Butler and Eichmann submitted reports and deposition testimony that Plaintiffs claim establish evidence of (1) an 8.8 percent price premium attributable to Polaris's purported undisclosed exhaust heat defect and (2) cost-of-repair damages.

To calculate the price premium attributable to Polaris's alleged undisclosed exhaust heat defect, Butler and Eichmann were tasked with determining what the price of Polaris's affected ATVs would have been if Polaris had disclosed its existence. Butler did the first part: she created a conjoint survey to test whether exposure to a warning about an exhaust heat defect would decrease consumers' willingness to pay for Sportsman ATVs. (ECF No. 407-6 ("Butler 1st Rpt.") ¶¶ 17, 20.) Survey respondents completed a questionnaire that showed them various attributes associated with ATVs— *e.g.*, brand, engine size, front rack/rear rack capacity, suspension travel, ground clearance, and price. (*Id*. ¶ 42.) A key feature of Butler's survey is that those of her respondents who were sorted into a "Test" group were shown the following statement:

> Please note: the design of the Polaris Sportsman ATVs causes heat from the exhaust that can reach temperatures that exceed Polaris's specifications and can cause discomfort to riders and melt plastic parts.

(*Id*. ¶ 21.) Survey respondents who were sorted into a "Control" group were not shown that statement but were otherwise provided with the same information as members of

the "Test" group about ATV brands, attributes, and prices. (*Id.* ¶ 22.) All survey

respondents were then asked to choose the ATV they preferred after being shown various

brand, attribute, and price combinations. (*Id.* ¶¶ 48–49.) Using the information from this

survey, Butler calculated an average decline of $1,614 in willingness to pay for a Polaris

Sportsman ATV with the exhaust heat defect. (ECF No. 407-5 "(Butler 2d Rpt.") ¶ 92.)

Eichmann used the $1,614 figure calculated by Butler to conduct a market

simulation with the aim of determining the shifts in supply and demand in the market

that would affect pricing had the defect been disclosed. (ECF No. 407-13 ("Eichmann 2d

Rpt.") ¶ 22.) He relied on Butler's calculations to calculate shifts in the demand side of

the market. (*Id.*). For the supply side, he used historical data of units sold in the "1-Up

Big Bore" market segment in 2016 (*id.* ¶ 24), and Manufacturer Suggested Retail Price

("MSRP") data. (*See, e.g., id.* ¶ 43.) Eichmann's market simulation focused on four types

of ATVs: Polaris, Yamaha, CanAm, and Other (a composite of minor offerings in the

marketplace). (*Id.* ¶¶ 25–26.) He treated each of these as separate firms in his analysis,

assuming that each firm is profit maximizing. (*Id.* ¶ 27.) Although there are two

Sportsman ATVs in the "1-Up Big Bore" market—the Sportsman 850 and the Sportsman

1000—Eichmann created an "average" Sportsman to represent both of these by "taking

the unit sales weighted average of MSRP and physical characteristics across Sportsman

850 and 1000, while using the sum of the unit sales across these models as total sales."

(*Id.*) With these inputs on the supply side and Butler's input on the demand side,

Eichmann's market simulation determined that the price for a Polaris Sportsman after disclosure of the defect would have been 8.8 percent lower than consumers actually paid. (*Id*. ¶ 30.)

b.    Qualifications

"[I]t is the responsibility of the [Court] to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1127 (D. Minn. 2003) (citation and quotation marks omitted). Butler is the Managing Director at NERA Economic Consulting ("NERA"), where she is Chair of the Survey and Sampling Practice. (Butler 1st Rpt. ¶ 1.) She has a Master's degree in sociology from Temple University. (*Id*. Ex. A.) To this Court's knowledge, she has never been deemed unqualified to testify as an expert. And after the Court's review of her resume and work as a litigation expert, it concludes that she has considerable experience designing and implementing conjoint surveys. (*See, e.g., id.*) That is what she did here.

Polaris does not appear to dispute Butler's considerable experience with conjoint surveys. (*See, e.g.*, ECF No. 406 ("Polaris Daubert Reply") at 2.) At bottom, it contests whether Butler has the training and experience to calculate a demand curve. (*Id*.) But Butler does not hold herself out to be an economist. Nor is it this Court's understanding that, if a trial were held, Butler would be the one to explain to the jury what, if anything, her survey results have to do with shifts in the demand curve. The Court understands

that to be Eichmann's role. The Court is satisfied that Butler is qualified to testify as to the design and implementation of her conjoint survey.

Eichmann is a Director for NERA. (ECF No. 407-9 ("Eichmann 1st Rpt.") ¶ 1.) He has a Master's degree in Applied Economics from the University of Michigan. (Eichmann First Rpt., App. A.) He has over 20 years of experience as an economics consultant. (Eichmann 1st Rpt. ¶ 1.) The National Association for Certified Valuators and Analysts has certified him as a Master Analyst in Financial Forensics and a Certified Valuation Analysis. (Eichmann 1st Rpt., App. A.) Federal and state courts have deemed him qualified as an expert to testify to statistical methods, sampling, survey design, business valuations, and econometrics. (Eichmann 1st Rpt. ¶ 1.) To this Court's knowledge, he has never been deemed unqualified to testify as an expert.

Polaris contends that while Eichmann may be qualified to "estimate some types of alleged damages," he lacks the training and experience to conduct a market simulation. (Polaris Daubert Reply at 3.) But Eichmann has testified that while he has never "done [a] grab-a-willingness-to-pay figure market analysis the way [he did] here as a testifying expert on another case before," he has worked on "at least 20 or so" cases in which he received the results of a conjoint study and then used a market simulation to compute market equilibrium prices. (ECF No. 378-2 ("Eichmann Dep.") at 16:21–17:5; 18:23–19:2.) The Court is satisfied that Eichmann has sufficient training and experience to testify as to the design and results of his market simulation.

<u>c.</u>     <u>Scientific Validity</u>

To be admissible, expert testimony must be based on "reliable principles and methods." Fed. R. Evid. 702(c). Among the many factors courts consider to determine whether expert opinions are reliable are: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (cleaned up). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

Although it is a close question, the Court determines that Butler's methodology is admissible, and that Polaris's complaints about it go to its weight, not its admissibility. It is undisputed that conjoint questionnaires are not ordinarily designed to be given to separate "test" and "control" groups. (*See, e.g.*, Butler 2d Rpt. ¶ 46.) But the Court is persuaded that sufficiently similar approaches have been tested and subject to peer review, and thus the Court will allow it to be presented at trial. (*See, e.g.*, ECF No. 407-6 ("Mizik Supp. Rep."), App. 3 (listing published articles discussing atypical conjoint survey designs).)

The Court is also of the view that Butler's survey is sufficiently representative of the relevant population. Butler's sample contained prospective purchasers as well as

those who had bought a new ATV within five years of taking Butler's questionnaire. (Butler 1st Rpt. ¶ 31.) And it appears that Butler randomly assigned sample members to the "test" and "control" groups. (Butler 1st Rpt., Exhibit D at 5.) The Court finds the sample to be sufficiently representative of the relevant population—consumers whose views would have affected the market price of the Sportsman ATVs had Polaris disclosed the alleged exhaust heat defect—to be admissible.

Polaris's myriad arguments to the contrary do not persuade the Court. Among other things, Polaris contends that Butler's test and control groups were not properly randomized because both had too many women (Polaris's customers are primarily men) and the control group had too many Polaris owners. The Court is not convinced by Polaris's argument that randomization failed because the demographics of Butler's survey sample differ from those of actual Polaris buyers. The population of Polaris buyers is surely smaller than the population of prospective ATV buyers, and thus would be less reflective of the market. Nor is the Court convinced that the presence of additional Polaris owners in the control group means that randomization failed.

Polaris also contends that Butler made various mistakes in designing her survey. Among other things, it argues that the purchasing environment simulated by Butler's survey was "divorced from the undisputed facts," that it made members of the "control" group pay undue attention to the exhaust-heat warning, that her survey omitted certain key attributes that actual ATV purchasers find most important, and that Butler

misinterpreted the results from the software she used to generate her findings. (ECF No. 374 ("Polaris Daubert Br.") at 21.) These are matters for cross-examination and do not mandate the exclusion of her opinions and testimony. *See, e.g.*, *Murphy v. Wheelock*, No. 16-CV-2623 (DWF/BRT), 2019 WL 3719035, at *5 (D. Minn. Aug. 7, 2019) (concluding that defendant's criticisms of expert's methodology were matters to be addressed on cross examination).

The Court also concludes that Eichmann's methodology is admissible. There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world. Polaris's dispute is over many of the assumptions Eichmann made before running his market simulation. Among other things, it argues that Butler's survey results could not give Eichmann the proper inputs for a demand curve, that Eichmann should have not assumed that the "1-Up Big Bore" market segment was representative of the markets where the Sportsman ATVs are sold, that Eichmann should not have combined Polaris Sportsman 850 and Polaris Sportsman 1000 data to create an "average" Sportsman, that Eichmann should not have combined the smaller actors in the "1-Up Big Bore" market segment into one firm, and that Eichmann should not have used MSRP for price data. Although it is again a close question, the Court concludes Polaris's challenges to Eichmann's methodology go to the weight, not the admissibility, of his opinion and testimony.

Eichmann's model is not so disconnected from the facts of the case that his opinion must be excluded. For example, although Polaris criticizes Eichmann heavily for using MSRP data when vehicles are ordinarily sold at individually negotiated prices (Polaris Daubert Reply at 13), Eichmann does not need actual prices to conduct his market simulation. Eichmann seeks to find the difference between Polaris's prices in the actual world (the world in which, according to the Plaintiffs' theory of damages, Polaris commanded a price premium) and in the Plaintiffs' counterfactual world (the world in which Polaris promptly disclosed the exhaust heat defect). It is not unreasonable to assume that MSRP data may be used to capture this difference—*i.e.*, the overcharge percentage—because there is some correlation between MSRP and actual price. That is, if Eichmann captured an 8.8 percent change in MSRP, then it is reasonable to assume that mirrors an 8.8 percent change in actual price. Whether changes in MSRP do or do not track changes in actual price is fodder for cross-examination.[16]

---

[16] In its summary judgment briefing, Polaris argues that because Eichmann's model relies on averages, the Plaintiffs offer no evidence that can be used to prove the named Plaintiffs' individual damages. (*See, e.g.*, Polaris Summ. J. Reply at 12 (arguing "average or 'normalized' data like Eichmann's cannot as a matter of law be used to prove individual (or, for that matter, class-wide) damages").) This is another attack on the assumptions underlying Eichmann's model and his subsequent calculation of an overcharge percentage attributable to the alleged defect—more ammunition for cross-examination. Polaris's cited authority stands for the uncontested proposition that "[w]hether a representative sample may be used to establish class-wide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016).

Polaris also points out that Eichmann did not report the margins of error for his calculations. Under *Daubert*, the "known or potential rate of error" is indeed important to assessing the scientific validity of an expert's methods. *Lauzon*, 270 F.3d at 687. The Court is satisfied that Eichmann's and Butler's work papers contained sufficient information to allow for computation of the potential rate of error, and their testimony will not be excluded on this basis.

d.   <u>Relevance</u>

"To show that the expert testimony is relevant, the proponent [of the expert testimony] must show that the reasoning or methodology in question is applied properly to the facts in issue." *Marmo*, 457 F.3d at 758. "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* Here, Butler opines that she has calculated an average decline of $1,614 in willingness to pay for Polaris Sportsman ATV with the exhaust heat defect. And Eichmann opines that, based on the $1,614 decline in willingness to pay and data he gathered from the "1-Up Big Bore" market segment, his market simulation calculates an 8.8 percent price premium that is attributable to the exhaust heat defect. The Court concludes that this evidence would be helpful to the jury's consideration of whether Polaris charged a price premium that can be attributed to an undisclosed exhaust heat defect.

Polaris disputes the relevance of Butler's testimony, and thus, the relevance of Eichmann's testimony as well. In particular, Polaris argues that Butler tested the wrong

proposition because her survey design does not take into consideration disclosures all ATV manufacturers make in their brochures and owner's manuals. This is, at bottom, a factual dispute between the parties as to the purchasing environment that would inform consumers' decisions in the counterfactual world. The Court concludes that the purchasing environment envisioned by Butler's survey "is sufficiently grounded in the facts of the case to be helpful to the jury." *Scoular Co. v. Ceres Glob. Ag Corp.*, No. CV 14-1881 (JRT/HB), 2017 WL 3535210, at *17 (D. Minn. Aug. 16, 2017).

e.      Eichmann's Cost-of-Repair Damages

Polaris also seeks to exclude Eichmann's calculation of cost-of-repair damages. Because Eichmann's cost-of-repair damages model is not relevant to Polaris's summary judgment motion, the Court need not opine on its admissibility.

3.      *Application of expert testimony to individual claims.*

According to Polaris, Plaintiffs' expert evidence is "irrelevant" because, contrary to the Plaintiffs' assertions, it does not prove "that each individual plaintiff was in fact damaged or that each plaintiff's damages were the same or similar." (ECF No. 399 ("Polaris Summ. J. Reply") at 12.) Polaris contends that the named Plaintiffs cannot rely on Butler and Eichmann, because the experts did not analyze each Plaintiff's claims individually. Rather, Butler and Eichmann opine as to "class-wide" damages, examining

the supply and demand side of the market.[17] Thus, Polaris argues, the experts are not legally competent to testify as to the hypothetical price of any single ATV, because the experts did not interview any Plaintiff or opine as to any individual's purported economic losses. (*Id.* at 19–20.)

To the extent Polaris argues that market-based expert evidence can never prove an individual plaintiff's overpayment, this contention finds no support in the law. *See, e.g.,* *Ebin*, 2014 WL 737878, at *2 (denying summary judgment on GBL claim after concluding that plaintiffs' market-based expert evidence was sufficient evidence of injury); *cf. In re* *Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d at 234–40 (concluding that "[a]lthough the issue [was] a close one," market-based expert evidence was insufficient to establish plaintiffs suffered damages under California, Missouri, and Texas law because the expert did not account for the interaction of supply and demand in the relevant hypothetical market conditions). None of the statutes at issue here precludes individual plaintiffs from relying on expert evidence of the shifts in supply and demand

---

[17] The Court's acceptance or rejection of expert testimony to support individual damages does not inform the Court's decision on class certification. Though Butler and Eichmann are referred to as "class-wide" experts, this term was coined by Plaintiffs, who are moving for class certification. Butler and Eichmann simply analyze a large base of consumers and provide a model of damages that Plaintiffs wish to apply to their individual claims. In general, Butler and Eichmann attempt to capture shifts in the market that would affect the market equilibrium price at which Sportsman ATVs would have sold had Polaris disclosed their heat issues, and from there extrapolate the price premium attributable to the alleged exhaust heat defect. The Court thus uses the term "market-based" evidence, rather than "class-wide" evidence, particularly in view of its decision to deny class certification.

affecting pricing if Polaris had disclosed that the Sportsman ATVs are at risk of overheating. And Polaris cites no case law interpreting any of the statutes in such a manner. Rather, courts applying these statutes have allowed market-based evidence to be used to establish the fact of injury and damages.

Like the *Suchanek* court, this Court concludes that market-based evidence may be used to establish the fact of injury under the CLRA, UCL, GBL, and NCUDTPA. 2018 WL 6617106, at *15–16 (determining that the price premium model set forth by plaintiffs could suffice to show injury). As to Florida, the Eleventh Circuit found that damages under the FDUTPA are measured by the difference between the market value of the product as promised and the market value of the product delivered, explaining that "the FDUTPA's 'benefit of the bargain' model provides a standardized class-wide damages figure because the plaintiff's out-of-pocket payment is immaterial." *Carriuolo*, 823 F.3d at 986 (noting that "the proper question is not how much the erroneous sticker may have reduced the vehicle's perceived value for any individual purchaser or lessee"). Based on the reasoning in *Carriuolo*, this Court concludes that Florida courts would allow an individual plaintiff's claim for damages under the FDUTPA to be proved using market-based expert evidence. As to Missouri, at least one court has concluded that the plaintiffs' alleged injury was subject to common proof under the MMPA. *See In re McCormick & Co., Inc., Pepper Prod Mtk'g & Sales Practices Litig.,* No. MC 15-1825 (ESH), 2019 WL 3021245, at *47 (D.D.C. July 10, 2019). In *In re McCormick*, the court reasoned that under the

plaintiffs' theory of causation and loss—that the plaintiffs had received less pepper than they thought they were purchasing—"every purchaser would have suffered the same loss." *Id*. It rejected the argument that individualized inquiries would be necessary to establish injury, emphasizing "the alleged injury is the difference in value of the pepper as represented and the value of the pepper as received." *Id.* Based on this reasoning, the Court concludes that market-based evidence may be used to establish the fact of injury under the MMPA.

Finally, as to Minnesota, based on the limited authority addressing this issue under the MCFA, the Court believes that market-based evidence may also be used to establish the fact of injury under the MCFA. *See, e.g.*, *Khoday*, 2014 WL 1281600, at *33 (finding Rule 23(b)(3) predominance satisfied for MCFA claims because plaintiffs "presented a method that allow[ed] for a determination of the actual value to consumers of" the product and damages were amenable to common proof).

While the cases above address evidence of injury and damages on a class-wide basis, rather than for an individual plaintiff, the Court does not find a compelling reason to preclude the named Plaintiffs from relying on market-based evidence of injury and damages where courts allow such evidence to support class-wide claims. Polaris's argument that the experts did not interview any Plaintiff or opine as to any individual's purported economic losses are best left to cross-examination. It is for a factfinder to decide whether such evidence proves the named Plaintiffs' injury and damages.

### B.    Fact Issues

Having determined the applicable legal standards, the Court turns to whether summary judgment is proper against any of the named Plaintiffs. It is Polaris's burden to show that no genuine dispute of material fact exists, under the law of the state of residence of each Plaintiff. For the reasons set forth below, it fails to meet that burden.[18]

#### 1.    Badilla and Wonders

Badilla's claims are governed by California law and Wonders's claim is governed by Missouri law. Polaris contends that Badilla cannot establish that he suffered an injury. Polaris does not dispute that Badilla can establish the other elements of his UCL and CLRA claims on the summary judgment record. For example, Polaris does not contest whether Badilla can establish that Polaris knew of the exhaust heat defect at the time of sale, as required under both the UCL and CLRA. Nor does Polaris contest whether Badilla can establish that Polaris's nondisclosure was an immediate cause of his injury-producing conduct, as required by the CLRA. Polaris only disputes whether Badilla has adduced evidence that he suffered an injury. Badilla has testified that, had he known that the Sportsman ATV he bought had the heat issues he experienced and learned about after his purchase, then he would not have bought it at all. (*See* ECF No 383-6 ("Badilla Dep.") at 204–05.) And the Court has concluded that Plaintiffs have adduced admissible evidence

---

[18] While repetitive, the Court discusses each named Plaintiff individually to emphasize that each Plaintiff's claims must be examined under the laws of his state of residence.

under California law of an 8.8 percent price premium attributable to the exhaust heat defect. Drawing all reasonable inferences in Badilla's favor, the summary judgment record suffices to at least create a genuine dispute of material fact as to whether Badilla suffered injury under the UCL and the CLRA. Thus, summary judgment as to Badilla will be denied.

Similar to Badilla, other than the fact and extent of injury, Polaris does not argue that any disputes exist that can affect the outcome of Wonders's claim under the MMPA. For example, Polaris does not dispute that Wonder can establish, on the summary judgment record, that Polaris failed to disclose to Wonders facts that Polaris knew or should have known. Again, Polaris only disputes whether Wonders has adduced evidence that he suffered an injury. Wonders, too, testified that had he known about the heat problems that he experienced later, he would not have purchased his Sportsman ATV. (*See* ECF No. 383-5 ("Wonders Dep.") at 235.) And following Missouri law, the Court will allow evidence of the price premium calculated by Butler and Eichmann to prove injury. Thus, because genuine disputes of material fact exist as to whether Wonders suffered an injury, awarding Polaris summary judgment against Wonders is not proper.

2.     *Johannessohn*

As to Johannessohn, Polaris contests both the causal nexus required by the MCFA and the evidence of injury. Polaris does not dispute that Johannessohn can establish the other elements of his MCFA claim on the summary judgment record. For example, Polaris

does not dispute that Johannessohn can establish that Polaris omitted a material fact or that special circumstances triggering a duty to disclose exist.

Polaris claims that Johannessohn cannot show that Polaris's omission had some effect on his decision to purchase a Sportsman ATV, because Johannessohn asked for and received a new ATV after his original Sportsman ATV caught fire. Johannessohn has an explanation: he testified that he thought his first Sportsman ATV was a lemon, that is, that the issues that caused that ATV to catch fire were unique to that first ATV. (*See* ECF No. 383-1 ("Johannessohn Dep.") at 393–400.) And he testified that he is unhappy with his second Sportsman ATV, too, and purchased a Can-Am Maverick "[s]o [he] had something to ride, because [he] couldn't ride [his] Polaris." (*Id*. at 222.) This testimony is sufficient to generate a genuine dispute as to whether there is a causal nexus between Polaris's actions and an injury.

Polaris also disputes whether Johannessohn has adduced evidence that he suffered an injury. Like the others, Johannessohn testified that, had he known that Polaris's Sportsman 1000 ATV had been suffering from heat-related issues and Polaris had no plans to fix it until model year 2017, he would not have purchased his Sportsman 1000 in August of 2015. (*Id*. at 393.) In light of this testimony and the expert evidence of an 8.8 percent price premium attributable to the exhaust heat defect, the summary judgment record suffices to create a genuine dispute as to whether Johannessohn suffered

an injury under the MCFA. Because genuine disputes of material fact exist, awarding Polaris summary judgment against Johannessohn is not warranted.[19]

3.    *Kelley*

Kelley's claim is governed by the FDUTPA. As with Johannessohn, Polaris contends that Kelley cannot establish causation or actual damages. Polaris does not dispute that Kelley can establish the other elements of his FDUTPA claim on the summary judgment record. For example, Polaris does not dispute that Kelley can establish that Polaris committed a deceptive act or unfair practice.

As with Johannessohn, Polaris contests Kelley's evidence of causation and injury. Polaris argues that Kelley "already knew about allegedly excessive heat—including melting parts—from owning prior Sportsman ATVs." (Polaris Summ. J. Br. at 28.) Kelley explained that although he had experienced problems with the heat emitted by his prior Sportsman ATVs, he thought that Polaris had done "some research" and "improved the design" and that therefore the Sportsman ATVs he purchased later would "stay cooler." (ECF No. 383-3 ("Kelley Dep.") at 96–98.) Kelley also testified that, had he known that Polaris's ATVs exceeded its own 115 degree "comfort threshold," he would not have purchased his Sportsman 1000 and 850 in 2016. (*Id*. at 189–90.) The Court finds this testimony sufficient to generate a genuine dispute as to causation.

---

[19] Polaris also argues that Johannessohn continued to drive his ATV after learning of the alleged exhaust heat defect, a fact which precludes him from demonstrating causation. *See* Polaris Summ. J. Reply at 18. This, too, raises an issue for a factfinder to decide.

Polaris also claims that, because Kelley had heat issues with his prior Sportsman ATVs, he purchased his Sportsman 1000 and 850 ATVs "with knowledge of their supposed defects." (Polaris Summ. J. Br. at 29.) Assuming without deciding that knowledge of the defects would bar recovery under the price premium theory of damages, the Court finds that Kelley's testimony above is sufficient to generate a genuine dispute as to this issue as well.

Finally, Polaris disputes whether Kelley has offered evidence that he suffered an injury. But, as noted above, Kelley testified that he would not have purchased his Sportsman ATVs in 2016 if he had known they suffered from heat issues. And the Plaintiffs have adduced evidence of an 8.8 percent price premium attributable to the exhaust heat defect. Thus, under the FDUTPA, drawing all reasonable inferences in Kelley's favor, the summary judgment record suffices to prove injury under the FDUTPA. Because genuine disputes of material fact exist, awarding Polaris summary judgment against Kelley is not proper.

4.     *Bates*

As a New York resident, Bates's claim is governed by the GBL. Polaris contends that Bates cannot recover because "New York consumers who know of the alleged omission cannot recover under" the GBL and Bates has adduced no evidence of injury. Polaris does not dispute that Bates can establish the other elements of his GBL claim on the summary judgment record. For example, Polaris does not dispute that Bates can

establish that the challenged act or practice was consumer-oriented or that it was misleading in a material way.

In support of its argument that Bates's knowledge of the exhaust heat defect prior to purchase bars his recovery, Polaris points to Bates's testimony that he had "heard about this [excessive heat] happening back as far as like 2012" from other consumers. (Polaris Summ. J. Br. at 29.) Polaris interprets Bates's statement to mean that Bates knew about the exhaust heat defect in its Sportsman vehicles as far back as 2012. (*See id.*) Plaintiffs disagree and, in light of Bates's subsequent testimony, interpret this statement to mean that Bates believes that Polaris should have known about the exhaust heat defect because many consumers were complaining about excessive heat "back as far as . . . 2012." (Pls' Summ. J. Opp. at 36–37.) Assuming without deciding that under the GBL, consumers' knowledge of the defect would bar recovery even under a price premium theory of damages, the Court finds that there is a genuine dispute as to whether Bates knew of the exhaust heat defect before purchasing his Sportsman ATV. That is, the Court finds that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and thus Bates's GBL claim is not barred as a matter of law. *Anderson*, 477 U.S. at 248.

As with the other Plaintiffs, Polaris disputes whether Bates has presented evidence that he suffered an injury. But Bates, like the others, has testified that, had he known that Sportsman ATVs suffer from heat issues, he "probably would have bought another

brand." (*See* ECF No. 383-4 ("Bates Dep.") at 128.) And the Plaintiffs offer expert evidence of a price premium attributable to the exhaust heat defect. Drawing all reasonable inferences in Bates's favor, genuine disputes of material fact exist as to whether Bates suffered an injury under the GBL, thus precluding summary judgment against Bates.[20]

5.    *Pinion*

Pinion is a North Carolina resident, and thus the NCUDTPA governs his claim. Polaris contends that Pinion cannot prove reliance and has adduced no evidence of injury. Polaris does not dispute that Pinion can establish the other elements of his NCUDTPA claim on the summary judgment record. For example, Polaris does not contest that Pinion can establish that Polaris committed an unfair or deceptive act or practice and that the action in question was in or affecting commerce. Nor does Polaris contest that Pinion can establish an omission relating to a material matter known by Polaris that it had a legal duty to communicate to Pinion.

Polaris argues instead that Pinion cannot prove actual reliance, which is required under the NCUDTPA. *See Bumpers*, 747 S.E.2d at 226 367; *Arnesen*, 781 S.E.2d at 7. Polaris maintains that Pinion cannot prove actual reliance because he purchased a used Sportsman ATV for his wife after experiencing difficulties with his own Sportsman ATV. But Pinion also testified that he bought the ATV for his wife used for $6,600—less than the $14,200 Pinion paid for his own Sportsman ATV—"not long after" purchasing his

---

[20] The Court disregards any arguments raised by Polaris for the first time on reply.

own Sportsman ATV. (ECF No. 383-2 ("Pinion Dep.") at 44, 61–62.) After he testified to his experience with side pieces melting on his Sportsman ATV, Pinion stated "I don't know who would want to buy an ATV that's having those problems." (*Id*. at 162.) The Court finds Pinion's testimony sufficient to generate a genuine dispute as to whether Pinion would have purchased his Sportsman ATV for $14,200 if he had known about the exhaust heat defect because the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248.

Polaris also argues that Pinion cannot prove justifiable reliance as required under the NCUDTPA. *See Bumpers,* 747 S.E.2d at 226; *Arnesen*, 781 S.E.2d at 7. Polaris contends that Pinion must prove that he "inquired, or was prevented from inquiring, about the allegedly omitted information," and that he has not done so. (Polaris Summ. J. Br. at 27.) Assuming without deciding that under applicable North Carolina law Pinion must make such a showing to prove justifiable reliance, the Court finds that Pinion's testimony is sufficient to generate a genuine dispute as to the issue. Pinion testified that, before he purchased his ATV, he saw a television advertisement released by Polaris, and read the product brochure published by Polaris. (Pinion Dep. at 50-51, 67–68.) Considering all reasonable inferences in Pinion's favor, there is a genuine dispute as to whether he inquired about the heat issues.

Finally, Polaris disputes whether Pinion has adduced evidence that he suffered an injury. But, as noted above, Pinion's testimony is sufficient to generate a genuine dispute

as to whether he would have purchased his Sportsman ATV for $14,200 if he had known about the exhaust heat defect. Moreover, Plaintiffs have adduced admissible evidence of an 8.8 percent price premium attributable to the exhaust heat defect. Thus, drawing all reasonable inferences in Pinion's favor, the record suffices to create a reasonable inference that Pinion suffered an injury under the NCUDPTA. Because genuine disputes of material fact exist, awarding Polaris summary judgment against Pinion is not proper.

In sum, Polaris has not met its burden and there is a genuine dispute as to some material facts, so summary judgment against Plaintiffs is denied.

## CLASS CERTIFICATION

Plaintiffs move for class certification under Rule 23 of the Federal Rules of Civil Procedure. "To certify a class, a district court must find that the plaintiffs satisfy all the requirements of Rule 23(a) and one of the subsections of Rule 23(b)." *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019). The party seeking class certification "must affirmatively demonstrate his compliance with the Rule." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Plaintiffs seek to certify a nationwide class of consumers who purchased Class Vehicles from October 4, 2010 to the present. In the alternative, they seek to certify six classes for residents of the states of California, Florida, Minnesota, Missouri, New York, and North Carolina who purchased Class Vehicles during differing windows of time. (*See*

*generally* ECF No. 332.) For the reasons below, the Court finds that Plaintiffs do not meet their burden under Rule 23.

## I.     Standing

The Court first addresses Polaris's argument as to standing, because it is jurisdictional and therefore foundational. The jurisdiction of federal courts extends only to actual cases or controversies. U.S. Const. art. III, § 2, cl.1; *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). The Eighth Circuit has held that under the case-or-controversy requirement, a "class must be defined 'in such a way that anyone within it would have standing.'" *Stuart*, 910 F.3d at 377 (8th Cir. 2018) (quoting *Avritt v. Reliastar Life Ins. Co*, 615 F.3d 1023, 1034 (8th Cir. 2010)). In other words, a "named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Avritt*, 615 F.3d at 1034.

To understand the standing argument in this case, one must review the Eighth Circuit's rules applicable to cases involving "latent" defects. In cases where a physical defect is alleged, the Eighth Circuit has affirmed dismissal of class action warranty and consumer protection cases for failure to state a claim under the "manifest defect" doctrine. Under this doctrine, a plaintiff must establish that the product "exhibited the alleged defect"—that is, that the defect is not latent, but has manifested itself in the product. *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009). "It is well established that purchasers of an allegedly defective product have no legal recognizable claim where

the alleged defect has not manifested itself in the product they own." *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999).

In *O'Neil*, the Eighth Circuit affirmed dismissal of a class action seeking overpayment damages because the defect (a malfunctioning drop-side crib) had not manifested. 574 F.3d at 503–04. The Eighth Circuit called such suits "no-injury suits" and the classes that bring them "no-injury classes," citing, among other cases, its opinion in *Briehl*: "An overwhelming majority of courts have dismissed these unmanifested defect claims and rejected the idea that the Plaintiffs can sue manufacturers for speculative damage." *Briehl*, 172 F.3d at 630, *quoted in O'Neil*, 574 F.3d at 505.

Two years after *O'Neil,* the Eighth Circuit examined the manifest defect rule in the context of the *Avritt* standing analysis. In *In re Zurn Pex Plumbing Products Litigation*, the Eighth Circuit observed that "[i]n most cases the question whether a plaintiff has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." 644 F.3d 604, 616 (8th Cir. 2011) (cleaned up). The *Zurn* plaintiffs complained about leaky plumbing systems, and the defendant argued that the plaintiffs whose plumbing systems have not leaked (the "dry plaintiffs") had no standing and could not be represented by class members whose plumbing had leaked. The Eighth Circuit applied the *O'Neil* manifest defect rule to its standing analysis: "it 'is not enough' for [the] plaintiff 'to allege that a product line *contains a defect* or that a product is *at risk for manifesting this defect*; rather, the plaintiffs must allege that their

product *actually exhibited* the alleged defect.'" *Id.* (quoting *O'Neil*, 574 F.3d at 503 (emphasis added)); *see also Thunander v. Uponor Inc.*, 887 F. Supp. 2d 850, 864 (D. Minn. 2012). The court determined that the requirements for Article III standing were satisfied because the plaintiffs had adduced evidence that the defect in the pipes was "already manifest in all systems" because it would "afflict[] all of the fittings upon use, regardless of water conditions or installation practices*." Zurn*, 644 F.3d at 616–17.

Plaintiffs do not dispute that the manifest defect rule applies to Article III standing under *Zurn*; indeed, they argue that *Zurn* is the proper analogue to this case because they, too, have presented evidence that the design defect was manifest in all Class Vehicles. In contrast, Polaris likens this case to *O'Neil* and *Briehl*, among others, arguing that Plaintiffs have not brought forward proof that the alleged exhaust heat defect has manifested itself in all Class Vehicles.[21]

Against the landscape of this case law, Plaintiffs' evidence is insufficient to establish injury-in-fact for the class. This case is unlike *Zurn*, where the allegations and evidence did not merely establish pipe fittings that presented a "risk" of developing

---

[21] Following the *Zurn* rule, a court in this District recently rejected two claims against Polaris for allegedly defective ATVs, concluding that the plaintiffs lacked standing to assert their claims because they did "not allege, directly or by reasonable inference, that *all* of the vehicles that contain the defective engine *necessarily* overheat, catch fire, or otherwise malfunction." *In re Polaris Mktg., Sales Practices, & Prod. Liab. Litig.*, 364 F. Supp. 3d 976, 984 (D. Minn. 2019) ("Polaris Mktg. I") (emphasis in original); *see generally In re Polaris Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 18-CV-0939 (WMW/DTS), 2020 WL 919259, at *1 (D. Minn. Feb. 26, 2020) ("Polaris Mktg. II").

harm, which in that case was stress corrosion cracking in the pipes. 644 F.3d at 617. Rather, the *Zurn* plaintiffs alleged that stress corrosion cracking was "already manifest in all systems," and brough forward expert testimony opining that the stress corrosion cracking would occur in the pipes "as soon as they [were] exposed to domestic water." *Id*. [22]

The Class Vehicles are far more like the cribs in *O'Neil* and the brakes in *Briehl*. Plaintiffs' experts have opined that many of the Class Vehicles generated temperatures that caused discomfort, burned riders, and melted parts of afflicted ATVs. But Plaintiffs have adduced no evidence of a common design that necessarily manifests itself in discomfort, burns, or melting.

Plaintiffs claim that their expert, Colin Jordan, has identified that the Class Vehicles have "a common design for thermal management." (*See* ECF No. 335 at 15.) They claim they have "amassed a wealth of evidence that the Class Vehicles have a common design defect of excessive heat that extends across all versions of all those models," in particular, evidence that a "hot exhaust manifold sits obscured beneath a thin plastic side

---

[22] Because, as *Zurn* notes, the standing issue is intertwined with an analysis on the merits, the manifest defect rule has also been analyzed under state law, as was the case in *Briehl* and *O'Neil*. Since the Eighth Circuit addresses this issue as one of constitutional standing, the Court does so as well. *See, e.g., Penrod v. K&N Eng'g, Inc.*, No. 18-CV-02907 (ECT/LIB), 2020 WL 264115, at *3 (D. Minn. Jan. 17, 2020) ("The law is clear in the Eighth Circuit that a federal court lacks subject-matter jurisdiction over absent class members' defective-product claims if there is no allegation that the product manifested the defect.").

cover, and the high [exhaust gas temperatures] and low clearance create melt risks to the ATV and burn risks to the rider." (*See id.* at 30.)[23]

A review of the record indicates that Plaintiffs paint with too broad a brush in their attempt to identify a design defect universal to all Class Vehicles. The Class Vehicles encompass ATVs with different body architectures and different heat management systems that pose different melting and burning risks. (*See generally* ECF No. 368 (filed under seal).) They include Sportsman 450s, 570s, 850s, and 1000s. These have four different engine sizes: 499 cubic centimeters, 567 cubic centimeters, 850 cubic centimeters, and 952 cubic centimeters, respectively. The Sportsman 450s and 570s have single cylinder engines and the Sportsman 850s and 1000s have dual cylinder engines. They also differ in engine orientation. The engines in the Sportsman 450s and 570s have an east-west orientation while the engines in the Sportsman 850s and 1000s have a north-south orientation. These differences result in differences in the ways the Class Vehicles route exhaust gases. The exhaust pipe in the Sportsman 450s and 570s routes exhaust gases

---

[23] Plaintiffs presented a similar argument before Judge Schiltz in opposition to Polaris's motion to dismiss their amended complaint. Judge Schiltz rejected Polaris's argument that Plaintiffs lacked standing to represent class members who had purchased other Sportsman models or model years because Plaintiffs had "adequately pleaded standing by alleging that the entire Sportsman line shares the same design defect—the routing of high-temperature exhaust next to the rider's leg and under the rider's seat." (ECF No. 42 at 13.) This Court agrees that the Complaint on its face alleges a common design defect. But in response to Plaintiffs' motion for class certification, Polaris has presented evidence that the Class Vehicles differ significantly in their exhaust heat management—the issue at the very heart of Plaintiffs' case. As discussed further below, on this record the standing analysis therefore yields a different outcome.

from the engine toward the front and wraps around the front and side of the engine. The exhaust pipe in the Sportsman 850s and 1000s routes exhaust gases from the engine toward the side and back.

These differences appear to result in variations in how riders experienced problems with the heat emitted by Class Vehicles. For example, Polaris's riders complained most heavily that the Sportsman 570 blew hot on air on them, specifically, their right legs. (*See, e.g.*, ECF No. 340-26 ¶ 21(a).) In comparison, complaints about the Sportsman 850s and 1000s center around melting side panels. (*See* ECF No. 240-26 ¶ 21(b).) Indeed, Polaris has offered different fixes for heat problems associated with the Sportsman 450s and 570s than those associated with the Sportsman 850s and 1000s. For the Sportsman 450s and 570s, Polaris offered a right-hand side panel close-off kit to block heat from hitting riders' right ankles and calves. (*See* ECF No. 340-26 ¶ 9(b).) For the Sportsman 850s and 1000s, Polaris issued a recall and provided dealers with a recall kit. (*See* ECF No. 340-26 ¶ 9(c).) Polaris's polling data indicates that proportionally fewer customers accepted the close-off kit on the Sportsman 450s and 570s than the recall kit on the Sportsman 850s and 100s.

Plaintiffs' expert nonetheless contends that the Class Vehicles "had a [common] design problem, namely[,] the lack of a sufficient air gap and insufficient heat protection

for machine, rider, and other critical components." (*See* ECF No. 340-26 ¶ 21.)[24] But the record does not indicate that, as a matter of design, low clearances across the Class Vehicles rendered them defective. For example, Polaris employee Robin Stroot, himself a Sportsman ATV owner, testified that while some Polaris employees reported that the side panels of their Sportsman 850s were melting, he had no such problems. (*See* ECF No. 340-10 at 95.) One of those employees, an engineer, determined that his exhaust pipe was touching the nylon side panel. (*See id.* at 97.) Stroot determined that his own Sportsman 850 had a gap between the pipe and the nylon. (*See id*.) And he testified that the model used at the time had a six and-a-half millimeter gap between the exhaust pipe and side panel. (*See id*.) Stroot testified that with the clearance between the exhaust pipe and the side panel on his vehicle, he never had an issue. (*See id.* at 240–41.) But he testified that Polaris is aiming to increase the gap to "make sure" that it is "covered for any kind of manufacturing tolerances" because six and-a-half- millimeters "doesn't suffice for manufacturing tolerance." (*See id.* at 241.) As evidence of consumer complaints bore out, this means that, as in *O'Neil*, some Sportsman ATVs will exhibit heat-related issues (discomfort, burns, melting), while others will not.

Thus, the allegations and the evidence establish that the vehicles are *at risk of* overheating and causing discomfort or injury. Eighth Circuit law is clear that this

---

[24] As noted above, the record indicates that mechanisms for heat management differ across the Class Vehicles.

distinction is critical. *Briehl*, 172 F.3d at 627. Plaintiffs' inability to bring forward evidence of a defect that manifested in the Class Vehicles dooms the class on standing grounds. *See, e.g.*, *Penrod*, 2020 WL 264115, at *4 (dismissing plaintiffs' class action complaint on standing grounds because on its face the proposed class included purchasers of oil filters that never exhibited a defect); *Polaris Mktg. I*, 364 F. Supp. 3d at 984.

Plaintiffs argue that their case is different, because their case involves the theory of economic loss from customer dissatisfaction due to risk of overheating. According to Plaintiffs, the economic loss allegation is sufficient to confer standing. Eighth Circuit case law suggests that it is not. Economic loss was also alleged in *Briehl* and *O'Neil*, and under those cases and *Zurn*, there must be *some* defect manifested for the class to be dissatisfied. As noted above, Plaintiffs do not present evidence that all Class Vehicles contained a defect that actually manifested. In short, the theory Plaintiffs assert—that *all* Class Vehicles had a design defect causing "excessive heat" such that customers were overcharged for their Sportsman ATVs because the ATVs did not perform as expected— is not borne out by the record before the Court. Because class membership depends on Class Vehicle ownership, there are members of Plaintiffs' proposed class who fall outside of the group of those who experienced excessive heat issues. Those class members do not have standing, and the class cannot be certified. *See, e.g.*, *Phelps v. Powers*, 295 F.R.D. 349, 353 (S.D. Iowa 2013) (concluding proposed class could not be certified because it was not defined to include only class members with Article III standing).

## II.    Rule 23(b)(3): [25] Predominance

Even if the standing issue did not require the Court to deny class certification,

Plaintiffs' proposed class cannot meet the requirements of Rule 23(b)(3), which is the

alleged vehicle by which they seek certification.[26] Under Rule 23(b)(3), "a district court

must find 'that the questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to

other available methods for fairly and efficiently adjudicating the controversy." *Stuart*,

910 F.3d at 374 (quoting Fed. R. Civ. P. 23(b)(3)). "The 'predominance inquiry tests

whether proposed classes are sufficiently cohesive to warrant adjudication by

representation.'" *Id.* at 374–75 (quoting *Amchem*, 521 U.S. at 623 ). It is satisfied "if 'the

---

[25] Because the predominance requirement of Rule 23(b)(3) is more demanding than the commonality and typicality requirements of Rule 23(a), and all four requirements of Rule 23(a) must be satisfied for a proposed class to be certified, the Court need not address Rule 23(a) to rule on the Plaintiffs' motion for class certification. *See Amchem Prod, Inc. v. Windsor*, 521 U.S. 591 (1997) ("Even if Rule 23(a)'s commonality requirement may be satisfied by that shared experience, the predominance criterion is far more demanding."); *see, e.g., Avritt*, 615 F.3d at 1029 ("Like the district court, we will assume that the Avritts could satisfy the prerequisites of Rule 23(a) and will focus our attention on their arguments that the class should be certified under Rule 23(b)(2) or 23(b)(3).")

[26] In the Order on Defendant's Motion to Dismiss, Judge Schiltz noted, "The Court tends to agree with those courts that have found that, in the context of a putative class action, the question whether a named plaintiff may represent class members who purchased products that differed in some respect from the product purchased by the named plaintiff is not an issue of standing, but rather an issue to be resolved at the class-certification stage." (ECF No. 42 at 12.) This Court, too, agrees that the challenge presented here—that of whether a named plaintiff may represent class members who purchased products different from the product purchased by the named plaintiff—is better suited for a predominance inquiry than a standing inquiry. The Court will therefore address both.

common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* at 375 (quoting *Tyson Foods, Inc.*, 136 S. Ct. at 1045). "The superiority requirement asks whether the class action is the best available method for resolving the controversy." *Cullan & Cullan LLC v. M-Qube, Inc.*, No. 8:13CV172, 2016 WL 5394684, at *6 (D. Neb. Sept. 27, 2016).

## A.     *Proposed Nationwide Class*

The Eighth Circuit has explained that "an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." *St. Jude I*, 425 F.3d at 1120. The same three-part test applies to the choice-of-law analysis in the context of class certification. As set forth above, this Court has analyzed the consumer protection laws of each of the named Plaintiffs' states of residence and found outcome-determinative conflicts. And Plaintiffs acknowledge that the consumer protection laws of 19 other states conflict with the MCFA. (Pls' Class Cert. Br. at 33.) This Court has considered the constitutionality of applying the MCFA extraterritorially, as well as the five-factor test, and found that the MCFA should not be applied to the claims of nonresident Plaintiffs. And as the Eighth Circuit has noted, "'[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *St. Jude I*, 425 F.3d at 1120 (quoting *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018). Thus, the Court cannot apply the MCFA to Plaintiffs' proposed nationwide class. And, as discussed in detail above, the Court has

identified various outcome-determinative differences among Plaintiffs' states' consumer protection statutes. The Court concludes that due to these differences in state law, "individualized legal issues will substantially predominate over common legal issues in this litigation." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. 245, 266 (D. Minn. 2018) (collecting cases). The Court would be required to apply a wide range of legal standards to adjudicate class members' claims. Because these individualized legal analyses would overshadow the common issues, the Court cannot certify a nationwide class under Rule 23(b)(3). *See id.*

Even if the Court could apply the MCFA to Plaintiffs' proposed nationwide class, individualized evidence supporting elements of Plaintiffs' claims would predominate over common issues. As the Eighth Circuit held in *St. Jude II*, although individual plaintiffs may not be required to present direct proof of individual reliance under MCFA, defendants may "present evidence negating a plaintiff's direct or circumstantial showing of causation and reliance." 522 F.3d at 836. It concluded that given the showing by St. Jude that it would "present evidence concerning the reliance or non-reliance of individual physicians and patients on representations made by St. Jude," it was clear that there would be plaintiff-by-plaintiff determinations and "common issues [would] not predominate the inquiry into St. Jude's liability." *Id.* at 840. On remand, the district court concluded that although the *St. Jude II* court primarily focused on the plaintiffs' MCFA misrepresentation claims, under its reasoning the plaintiffs also could not satisfy the Rule

23 requirements with respect to their MCFA material omissions claims. *In re St. Jude Med. Inc. Silzone Hearts Prods. Liab. Litig.*, No. 01-CV-1396 (JRT/FLN), 2009 WL 1789376, at *3–*5 (D. Minn. June 23, 2009). Like the defendant in *St. Jude II*, Polaris is prepared to present evidence to dispute the causal nexus between Polaris's actions and the alleged injury the class members suffered. Polaris's rebuttal opportunity requires plaintiff-by-plaintiff determinations of causation.

The Court is not persuaded by Plaintiffs' arguments to the contrary. Among other things, Plaintiffs claim that its evidence of an 8.8 percent price premium can establish the causal nexus required by the MCFA because "[t]he overcharge theory shows that everyone who bought overpaid, no matter what they saw or what they knew." (Pls' Class Cert Reply Br. at 13.) In other words, "the overcharge theory makes individual knowledge (like individual reliance) moot." (*Id*. at 14.) As the Court has noted above, the MCFA still requires a plaintiff to establish that the defendant's conduct had some impact on inducing the individual plaintiff's actions. What Plaintiffs request is for the expert-driven overcharge theory to supplant required showings of causation, injury *and* damages. No court considering the MCFA has allowed such an expansive use of this theory, and it is not appropriate in this case either.

For these reasons, Plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirements with respect to their proposed nationwide class, and class certification will be denied.

### B. Proposed Statewide Classes

Each of proposed statewide classes must also satisfy the requirements of Rule 23(b)(3).[27] *Stuart*, 910 F.3d at 374. Here, too, individualized issues as to injury and causation or reliance would predominate in the proposed California and North Carolina classes, in addition to their proposed Minnesota class. As explained above, individualized issues predominate for claims governed by Minnesota law. Because the UCL, CLRA, and NCDUTPA all require actual reliance, individualized issues would also predominate as to claims governed by these laws.

### III. Superiority

To determine whether a class action is the best available method to resolve a dispute, courts examine whether a class action would be manageable. *In re Baycol Prods. Litig.*, 218 F.R.D. at 209. One of the Court's considerations is whether variations in state law render class action unmanageable. *See, e.g., id.* at 209–10; *Bridgestone/Firestone*, 288 F.3d at 1018 ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").

Nationwide class treatment would not be a superior method of adjudication here. As explained above, the Court cannot apply the MCFA extraterritorially to Plaintiffs'

---

[27] As to statewide classes, because of the Court's determination on predominance, the Court again does not reach the Rule 23(a) factors.

proposed nationwide class, and class treatment is not appropriate under the laws of so many different states. *Bridgestone/Firestone*, 288 F.3d at 1018.

That leaves the only logical alternative to be six statewide classes. Proceeding in such a manner would present a significant risk of jury confusion and would create enormous challenges to trial management. Individual issues would dominate the trial, including the different Sportsman ATV models and mechanisms for routing heat exhaust, the issue of causation, and individualized inquiries into each Plaintiff's knowledge and experience with the Sportsman ATV, where necessary under applicable state law. The management of such a trial is not superior to more individualized methods of adjudication. Thus, the Court declines to certify subclasses as well. *See Bridgestone/Firestone*, 288 F.3d at 1018-19 (noting the variability in proof for each claim and concluding that "this litigation is not manageable as a class action even on a statewide basis"); *In re Tetracycline Cases*, 107 F.R.D. 719, 733 (W.D. Mo. 1985) (declining to certify subclasses where keeping track of each subclass would likely confuse the jury and complicate structuring and managing trial).

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.  Polaris's Motion to Exclude Expert Testimony (ECF No. 371) is DENIED;

2.  Polaris's Motion for Summary Judgment (ECF No. 356) is DENIED; and

3.  Plaintiffs' Motion to Certify Class (ECF No. 332) is DENIED.

Dated: March 31, 2020                    BY THE COURT:

                                         s/Nancy E. Brasel
                                         Nancy E. Brasel
                                         United States District Judge